Roy C. Anderson, et al., Plaintiffs-Appellees, v. Long Grove Country Club Estates, Inc., et al., Defendants-Appellants.

Long Grove Country Club Estates, Inc., a Corporation, Counterclaimant-Appellant, v. Roy C. Anderson, et al., Counterdefendants-Appellees.

Gen. No. 68–101.

Second District.

June 23, 1969.

Rehearing denied July 30, 1969.

Snyder, Clarke, Dalziel, Holmquist & Johnson, of Waukegan, for appellants.

Donald T. Morrison, Morrison and Nemanich, of Waukegan, and Warren M. Browning and A. E. Peterson, of Chicago, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

This is an action brought by the plaintiffs to recover damages for the alleged breach by the defendant of a contract for the sale of certain real estate. While there are several parties plaintiff and defendant, including corporate entities for purpose of the contracts in question, for the sake of simplicity we will refer to the plaintiffs as "seller" and the defendants as "buyer" without differentiating between the individual and corporate parties.

The matter was tried before the court without a jury. The court found that the buyer had breached the contract, and it awarded damages to the seller and dismissed the buyer's counterclaim. The buyer then appealed to this court. The complex factual background, when reduced to the essentials necessary to an understanding of the issues and their determination, is as follows:

Some time in 1961, the buyer's real estate firm received a listing from the seller for 337 acres of his land at a gross price of $2,500 per acre. The seller, who owned a total of 508 acres, had indicated to the buyer that he proposed to build a golf course adjacent to this land. Shortly thereafter, the buyer advised the seller that the asking price was too high and in a letter dated January 23, 1962, he outlined a rough draft of a proposal to the seller.

Under this proposition, the buyer would allow the seller to participate in the overall potential profit of the subdivision without losing his capital gain status or right to report the sale on an installment basis. He suggested that, with existing development costs, the break-even price on lots would be $5,000; that initially, lots not on the golf course would be offered at $5,000 and lots on the golf course at $6,000 to $7,000; and that after the subdivision was started, and the golf course available, the lots would sell at an average of $9,000.

The buyer explained in his letter that he arrived at the figure from the knowledge that a home builder is willing to pay from 20 to 25% of the total home value for the site; and that he estimated from the restrictions the parties had discussed, that home values would range from $40,-000 to $60,000. He stated that there was the additional unknown factor of what extra a homeowner would pay for a "golf course location." From this, the buyer concluded that his estimate of average lot price was probably conservative.

The buyer pointed out that the draft of the proposed agreement had a base lot price of $2,000 to the seller, plus a 40% bonus of that portion of the resale price over $5,000; and that based upon the anticipated average value of $9,000 per lot, the seller's gross return would be approximately $1,070,000, or roughly, a quarter of a million more than his present asking price of $2,500 per acre. This letter was the genesis of the agreements to follow.

On April 30, 1962, the first of the agreements outlining the relationship of the parties was executed. This provided that the seller would sell 337 of his 508 acres to the buyer at a base purchase price of $640,000, assuming the land could be subdivided into 320 lots. The purchase price was to be paid as follows:

 

| | | | | | |
|---|---|---|---|---|---|
| $15,000 | on | or | before | August 31, | 1962 |
| 50,000 | " | " | " | December 31, | 1962 |
| 285,000 | " | " | " | April 1, | 1963 |
| 72,500 | " | " | " | April 1, | 1964 |
| 72,500 | " | " | " | April 1, | 1965 |
| 72,500 | " | " | " | April 1, | 1966 |
| 72,500 | " | " | " | April 1, | 1967 |

In addition to the base price, the buyer was to pay to the seller, upon the resale of the lots, the additional sum of 40% of the gross sales price of each lot in excess of $5,000. The complete control of the resale was to be in the buyer, however, and no agency or joint venture was intended. The buyer was given the right to prepay any or all amounts, with certain limitations only in the year 1962. Title to individual lots was to be conveyed to the buyer as payments were made, at the rate of one lot per $2,000.

The buyer was to undertake the annexation of the property into the Village of Long Grove, and to assume all of the costs and obligations of subdividing the property. The seller's only obligation in this regard was to obtain a survey so that accurate legal descriptions could be procured of the property which the seller was retaining, and the remaining property which was subject to the agreement.

The agreement further provided that upon completion of the platting, annexation into and zoning by the Village and the survey, an escrow would be entered into with the Chicago Title and Trust Company to implement the undertakings. Under the terms of the escrow, the monies to be paid by the buyer to the seller pursuant to the agreement were to go through the escrow; the title to the property was to be in Chicago Title and Trust Company, as Trustee, and it was to convey the lots out to the buyer, or his nominee, at the rate of one lot per $2,000 paid on the

base purchase price; and in the event there was a default by the buyer, the title to the property still in the name of Chicago Title and Trust Company, as Trustee, was to be held or conveyed back to the seller. The agreement provided that if the buyer defaulted in any of the buyer's undertakings and the same were not cured within 30 days, the seller would then have the right, upon notice to the buyer, to terminate all of the buyer's rights, and all prior payments would be forfeited.

Another agreement was also executed on April 30, 1962, under which the seller recited that he proposed to develop the 171 acres, which were not sold to the buyer, as a golf club, and that it would be beneficial to both parties to develop the golf club and the residential subdivision simultaneously. The agreement provided that the seller would engage the golf course architect upon the initial payment of $15,000 being made, as provided in the contract of sale, and that the seller would commence construction on the golf course upon the payment of the December 15, 1962, and April 1, 1963, installments. Nothing was specified with reference to membership of lot owners in the club; however, it was stated that the buyer was to construct certain lakes on the land which he purchased; that the lot owners, adjoining the lakes for which the buyer paid the entire cost, would have the exclusive use thereof; and that the lakes, wherein the buyer shared the cost with the seller, would be available to golf club members, guests and invitees.

Thereafter, negotiations commenced with the Village of Long Grove which finally, in the fall of 1962, resulted in an agreement under which only 271 lots—as opposed to the contemplated 320—could be developed on the subject property after annexation. This meant, of course, that the seller could anticipate receiving substantially less for his land. Also, he was advised that the golf course was

going to cost at least $840,000, which was more than had been contemplated.

The parties then entered into new contracts in November of 1962, which were dated back to May 1, 1962. The new sales agreement stated that the base price was to be $840,000, rather than the $640,000 earlier agreed upon, and provided for an additional $200,000 payment to be made on or before April 1, 1968. The new contract specified that the 40% additional payments made by the buyer to the seller on the excess of resale price over $5,000 were to be credited against this last $200,000 payment. However, if the 40% payments exceeded the sum of $200,000, the surplus amount would be paid to the seller. Thus, the contract was for a guaranteed minimum of $840,000. The balance of the agreement was essentially the same as the one dated April 30, 1962.

The second contract entered into in November of 1962 and dated May 1, 1962, related to the golf course and lakes—as did the second contract of April 30, 1962. The new contract provided that the buyer pay for the construction of all the lakes on the land purchased by him, except the north lake; and that the seller pay one-half the cost of that lake and have the use of the same as a water reservoir for the golf course. No other rights with reference to the lake were to be accorded to club members, except that the club was given permission to use the streets in the subdivision for the transportation of its equipment from the machinery sheds to the golf course. Nothing was said in the agreement regarding membership of subdivision lot owners in the club.

The escrow was established on November 20, 1962, and at the same time title was conveyed to Chicago Title and Trust Company, as Trustee. Since neither party wanted the other to act as beneficiary under the trust, Robert Ford, the seller's attorney, was designated as the

beneficial owner under the trust to act upon the joint direction of the seller and the buyer, unless there was a default, in which event, he was to act upon the direction of the party not in default, or upon court order.

The parties then embarked upon their undertaking. The seller built the golf club at a cost of over $1,000,000, and the buyer proceeded to sell lots. In the initial advertisements, the buyer apparently represented the lots as adjoining a new "private" club. The seller wrote the buyer immediately (January 18, 1963), advising the buyer that while he hoped to operate the golf course as a private club, it might not be possible, and that the club might be conducted as a daily fee course.

On August 15 and September 15, 1963, the seller again wrote to the buyer in regard to the latter advertising lots as including membership in a proposed private club, again cautioned the buyer that there was no assurance that this would be a private club and that in all likelihood it would be a daily fee or semiprivate club, and advised against advertising that lot owners would be given membership priority. The seller indicated that the club planned to open June 1, 1964; that the lots sold and homes built in the subdivision could not support a club and that the advertising was harmful to the proposed club and to the seller. He suggested that the buyer correct his advertising and make no false statements with regard to the club.

In the meantime, the buyer had not made the payment of $285,000 which became due on April 1, 1963. On August 21, 1963, it was agreed that he could have until September 30, 1963, to make this payment and it was made in October of 1963.

On May 7, 1964, the parties again amended their basic sales agreement. They altered the method of paying the base price to the following:

$15,000 on or before November 15, 1962
 50,000 " " " January 15, 1963
285,000 " " " April 1, 1963
 47,500 " " " April 1, 1964
 47,500 " " " April 1, 1965
 47,500 " " " April 1, 1966
 47,500 " " " April 1, 1967
300,000 " " " April 1, 1968

In addition, three designated lots were to be conveyed to the seller. Certain other matters which are not pertinent here, were provided for in the contract.

During 1965, many difficulties developed between the parties, and it appeared that the buyer experienced financial problems. During the spring of 1965, the buyer owed the seller $7,400 by virtue of the 40% bonus payments which were unpaid. The buyer had suggested that he might wholesale or sell out all of the lots; the seller had requested an accounting, and had declined to direct the trustee to convey certain portions of the subdivision to the buyer. One of the lots which was to be conveyed to the seller under the amendment to the agreement, dated May 7, 1964, had not been conveyed to him by the buyer.

The $7,400 bonus payments were finally paid in July of 1965. Later, in the same year, additional lots were sold upon which bonus payments were due, but not paid by the buyer. These totaled approximately $10,000. The payment of $47,500 due on April 1, 1966 was not made. On March 30, 1966, the buyer had tendered $22,000 of this amount and submitted directions for conveyance to the buyer of lots to cover the $22,000 payment. This tender was not accepted.

During all of this time, the parties had discussed their differences and attempted to settle their disputes. A number of proposals were made, and while it appears that

135

the buyer and the seller were near agreement several times, the contracts as reduced to writing were never acceptable to both parties. Shortly before this suit was filed, the attorney for the seller asked the buyer's attorney if there was to be a contract or a lawsuit, and was advised that there would be a lawsuit. The seller then filed this suit on June 8, 1966, asserting a breach of contract.

After the suit was filed, the golf course was sold to a private club. More than a year after the suit was commenced, the buyer offered to pay the seller $95,000—the payments due April 1, 1966, and April 1, 1967; to repay the seller the amount advanced for taxes; to pay $22,000 representing the 40% bonus payments then due; and further offered to convey the one lot still not conveyed to the seller under the 1964 agreement. This tender was refused.

The trial court entered judgment and found that the buyer had committed a material breach of the contract in failing to pay the $47,500 due April 1, 1966; in failing to pay the seller the $10,000 due on the bonus payments, and in failing to convey the one lot to be transferred to the seller. The court further found that the buyer also failed to pay $47,500, which was due on April 1, 1967; that the remedy set forth in the contract as to forfeiture was permissive, and not exclusive; that the seller had no obligation in reference to a golf course—except to construct one, which was done; that there was no obligation to offer club memberships to lot owners or to operate the golf club for the benefit of such purchasers; that the purchase price of the lots to the buyer was $2,000 per lot, plus 40% of the resale price in excess of $5,000; that 222 lots had been conveyed to the buyer and 64 of such lots had been conveyed by the buyer to third parties, leaving title to 158 lots in the buyer, most of which were subject to mortgage; that 47 lots still remained in trust, and that these should be treated as the property of the

seller; that the seller had been damaged in the sum of $252,800 by the buyer's breach of contract, plus the sum of approximately $22,000 on deposit by virtue of the 40% bonus payments owed to the seller on lots sold after the suit was commenced.

The court entered its order declaring that the sole right, title and interest in and to the 47 lots still held in trust and not yet conveyed to the buyer was in the seller. The court further entered judgment in favor of the seller in the sum of $252,800, plus the amount held by Chicago Title and Trust Company, as Trustee, on account of the 40% bonus on lots sold after suit was commenced; and also entered judgment against the buyer on its counterclaim.

The court explained the manner in which it determined the damage figure of $252,800: The unpaid purchase price on the lots conveyed by the seller to the buyer was the measure of the seller's damage. There were 158 such lots remaining which had not been resold by the buyer. The seller had received the initial $2,000 payment per lot, and the unpaid balance was 40% of the resale price of each lot in excess of $5,000. The court concluded that the parties contemplated an average resale price of $9,000 on the lots; that the average sale price of the lots to third parties by the buyer had been in excess of $8,500 per lot, with the sale price generally increasing over the years. In considering all of the factors, the court determined that the damages for the unpaid purchase price should be predicated upon an average resale price of $9,000 per lot. The result, was that 40% of the $4,000 (excess over $5,000) totalled $1,600 per lot or $252,800 for the remaining 158 lots.

The buyer here contends that the trial court—by awarding damages and at the same time decreeing that those lots which had not yet been conveyed to the buyer by the trustee should remain the property of the seller— blended mutually exclusive and inconsistent remedies,

one affirming and one disaffirming the contract; and that the judgment is thus erroneous, citing Wollenberger v. Hoover, 346 Ill 511, 543–545 incl., 179 NE 42 (1931); Morey v. Huston, 85 Ill App2d 195, 199, 200, 228 NE2d 544 (1967); Solomon Iron & Metal Co., Inc. v. Bradford, 33 Ill App2d 452, 455, 179 NE2d 697 (1962); 35 ILP, Vendor and Purchaser, § 151.

The seller counters that he did not declare a forefeiture or seek a rescission of the contract, but rather, that the buyer committed a material breach of the contract relieving the seller from further performance and entitling the seller to damages in the amount of the balance of the unpaid purchase price for the performance already completed by the seller.

We agree with the seller, and with the theory of the judgment as awarded by the trial court—the seller did not seek inconsistent remedies. At the time this suit was commenced, the contracts for sale between the parties were partially performed. Certain of the lots had been conveyed by the trustee to the buyer. Some of these lots had been reconveyed by the buyer to third parties; others, still owned by the buyer, had substantial encumbrances on them. As to these lots, it is apparent that the seller would not seek and could not obtain a rescission of his agreement. These were no longer available to be restored to him. The question of rescission, suggested by the buyer, is not present in the case; except, perhaps, that the contract at this point is divisible, at least to the extent that what amounts to a rescission is available as to a portion of the land, but not as to the remainder.

Thus, the trial court was of the opinion that the buyer had committed a material breach of the contract. The buyer's financial problems are apparent from the record. It would be patently unjust at this point to require the seller to transfer all of his remaining land, subject to the agreement, to the buyer and increase the amount of his money damages accordingly. The increased money dam-

ages might or might not be collectible; the land might go to other creditors of the buyer, or encumbrancers; or the land might merely have to be foreclosed on by the seller to satisfy the increased damages. This appears to be the type of case where a partial rescission could be upheld merely because under the peculiar circumstances of the case it is essential to a just result. 17 Am Jur2d, Contracts, § 488.

■ There is, of course, another theory under which the trial court's judgment was not inconsistent. If there was a material or total breach of the contract by the buyer, the seller had the right, under the circumstances, to forego further performance on his part and to seek recovery for damages already sustained. 17 Am Jur2d, Contracts, § 446; 4 Corbin on Contracts, § 946 (1951); 1954 Ill L Forum, 616. A material or total breach is a failure to do an important, substantial or material undertaking set forth in a contract.

■ The question of whether or not there was such a breach, sufficient to forgive future performance by the seller and to entitle him to damages already sustained, was a question of fact determined by the trial court, adversely to the buyer. We believe that the evidence as we have outlined it hereinabove was ample to support the trial court's finding of a material or total breach, justifying the type of relief awarded, and we will not overturn that determination. The testimony was contradictory and we will not substitute our judgment, as to the credibility of the witnesses, for that of the trial judge who saw and heard them, and we will not disturb his findings unless they are against the manifest weight of the evidence. Mortell v. Beckman, 16 Ill2d 209, 216, 159 NE2d 63 (1959); Stahelin v. Board of Education, School Dist. No. 4, DuPage County, 87 Ill App2d 28, 43, 230 NE2d 465 (1967).

■ When a contract for sale is partially executed and there is a material breach by the buyer, the seller may

refuse to make further conveyances under the contract, and may recover as damages the unpaid balance of the purchase price for those items already sold and delivered. W. H. Purcell Co. v. Sage, 200 Ill 342, 347, 65 NE 723 (1902); George H. Hess Co. v. Dawson, 149 Ill 138, 145, 36 NE 557 (1894); Wabash Portland Cement Co. v. Bracey, 160 Ill App 18, 21 (1911).

■ The buyer devotes a good portion of his argument to the contention that there was a forfeiture evoked by the seller under the contract, and recites a number of principles that would then be applicable under the law and under the terms of the contract. It should be apparent that we do not view the action of the seller as seeking to work a forfeiture. The seller was not satisfied, under the circumstances of this case, merely to seek a forfeiture of the monies paid by buyer. Obviously, this would have been a severely inadequate remedy. A good portion of the land was resold or encumbered by the buyer. A substantial amount of the purchase price was yet unpaid because of the lack of resales by the buyer. It should be obvious why the seller did not invoke the forfeiture provisions contained in the contract. The forfeiture remedy provided for in the contract was not exclusive, and the seller had the right to seek any other legal remedy available to him. Dasher v. Bruno, 5 Ill App2d 500, 504, 505, 126 NE2d 404 (1955); 17 Am Jur2d, Contracts, § 522.

Thus, neither the principles recited by the buyer applicable to forfeiture, nor the notice requirement contained in the contract in the event the seller were to declare a forfeiture, are deemed pertinent by us. Whatever rights or interests were possessed by the buyer in those lots not yet conveyed to him, could have been protected by performing his part of the contract. The trial court, having found a material breach under the legal principles related above, had the right to declare that the lots not yet conveyed to the buyer could be retained

by the seller. Indeed, the order of the court gave cognizance to the very purpose for which the trust, naming Robert Ford as beneficiary, was established. Under this trust, title was not conveyed to the buyer, but rather, was held by the trustee, for the purpose, among others, of securing the seller.

Much is made of the fact that the golf course was not constructed as a private club for the use of lot owners in the subdivision. However, every document relating to the golf course suggests just the opposite—that the golf course was not intended as a private club for the lot owners. The initial letter, wherein the buyer calculated the lot values, contained an estimate without considering the unknown evaluation effect of the golf course. That letter referred to the golf course "location" as perhaps adding value to the lots. None of the contracts suggests a tying-in of club membership and lot ownership. The letters from the seller consistently advised the buyer that the club and lots were not in any manner tied together. The action of the seller with regard to the golf course, which was in fact separate and apart from the land to be conveyed to the buyer, did not in any way justify or excuse the performance by the buyer, or lack of it.

■ The buyer also claims that the damages were excessive and that the seller got more under the judgment than he bargained for in his contract. We agree that the purpose of damages is to put the injured party in the position he would have been in had the contract been fully performed. 22 Am Jur2d, Damages, §§ 45, 46. The buyer states that with the money previously paid to the seller, the effect of the judgment is that the seller will receive $1,175,800—$335,800 more than the contract price of $840,000. Assuming that the buyer's figures are correct, several things are still ignored, viz.: (1), the contract did not anticipate $840,000 as the contract price, but rather, that this amount was the minimum, guaranteed amount; (2), from the very inception, the con-

templated amount was expressed in terms of a resale price of the lots of $9,000, or as suggested in the buyer's first letter, a return to the seller of $1,070,000; (3), the anticipated resale price appeared warranted from the actual experience and sales price of the lots, averaging in excess of $8,500 at the time of the suit; and (4), the buyer arrives at the figure of $1,175,800 by including therein, $9,000 for each of the 46 lots remaining in the seller, or a total of $414,000. Obviously, if the seller were to realize this amount on the lots, he would have to incur expenses in so doing.

 The trial court based its decision as to damages on what it determined to be the unpaid balance of the purchase price on the lots conveyed to and held by the buyer. This was proper. W. H. Purcell Co. v. Sage, supra; Gray v. Meek, 199 Ill 136, 138, 139, 64 NE 1020 (1902); Wabash Portland Cement Co. v. Bracey, supra; 22 Am Jur2d, Damages, § 64. The evidence was sufficient to justify the court's consideration of the factors it enumerated in determining the measure of damages.

The buyer also contends that the judgment of the trial court violates the rule set forth in Wilson v. Locigno, 259 Ill App 285 (1930): that, absent an acceleration clause, a seller may sue for installments only as they fall due. The buyer contends that the seller was not to be paid the 40% payments until the lots were resold. The difference in the two cases is that in Wilson there is a definite time set up for definite payments. That is not so in the instant case. After the $840,000 payment on the dates specified in the contract, the additional sums were to have been due, as the buyer states, on resale of the lots. The vulnerability of the buyer's position is that subsequent to this litigation there may well be little to motivate the buyer to sell the lots for the best price obtainable. This undoubtedly was considered by the trial court in determining the form the judgment should take. Under the circumstances, the ultimate resale price of the lots may

bear no relation to the judgment. If an unfair result arises from fixing a definite judgment at this time, it is the result of the peculiar factual background of the case. If someone must suffer slightly as a result, it is more just that it be the person committing the wrong, than the one wronged.

While the judgment was rendered on March 25, 1968, and as a result found the balance due to the seller, this balance still resulted in payments of less than the total $840,000 required under the contract to have been paid by April 1, 1968. From this point of view, for practical purposes, there was no acceleration.

Other points are mentioned by the parties, which to repeat at length, would unduly extend this already too lengthy opinion. The points relate to basic premises which are rejected by the court, as should be apparent to the parties from the position taken in this opinion. It would serve no purpose to detail them here.

For the reasons stated herein, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN, P. J. and ABRAHAMSON, J., concur.