BYE, Circuit Judge.
In 1996, Interstate Bakeries Corporation granted licenses to some of its trademarks to Lewis Brothers Bakeries, Inc., in certain Illinois territories. In 2004, Interstate Bakeries Corporation filed for Chapter 11 bankruptcy, and later contended its licensing agreement with Lewis Brothers Bakeries was an executory contract, subject to assumption or rejection under 11 U.S.C. § 365. The bankruptcy court agreed and concluded the agreement was an executory contract. The district court[1] affirmed, also concluding the agreement constituted an executory contract because a material obligation remained. We affirm.
I
In 1995, Interstate Bakeries Corporation (“Interstate”) announced its acquisition of Continental Baking Company, the owner of the Wonder Bread and Hostess brands and trademarks. The United States Department of Justice brought an antitrust action against Interstate challenging the proposed acquisition. United States v. Interstate Bakeries Corp. & Cont’l Baking Co., No. 95 C 4194, 1995 WL 803559 (N.D.Ill. Aug. 7, 1995). On January 9, 1996, the United States District Court for the Northern District of Illinois entered final judgment in the action, requiring Interstate to divest itself of certain rights and assets to allow the acquisition to go through, in order to create viable competition of “White Pan Bread” in and around the Chicago, Illinois, area.
*1072 Interstate Brands Corporation (IBC), a subsidiary of Interstate, subsequently entered into a $20 million Asset Purchase Agreement and License Agreement with Lewis Brothers Bakeries (LBB), whereby IBC sold to LBB its Butternut Bread baking and business operations and assets in the Chicago territory and its Sunbeam Bread baking and business operations and assets in the Central Illinois territory. In accordance with the terms of the final judgment, the License Agreement granted to LBB a “perpetual, royalty-free, assignable, transferable, exclusive” license to use the brands and trademarks in the respective areas. The parties allocated $11.88 million of the roughly $20 million purchase price to various tangible assets, with the remaining $8.82 million allocated to intangible assets, including the license.
On September 22, 2004, Interstate and eight other subsidiaries and affiliates, including IBC, filed Chapter 11 voluntary bankruptcy petitions. In November 2008, IBC filed an amended plan of reorganization, in which it contended the License Agreement with LBB was an executory contract, subject to assumption by the estate under 11 U.S.C. § 365.
LBB thereafter filed an adversary proceeding within the bankruptcy case for a declaratory judgment that the License Agreement was not an executory contract. The bankruptcy court disagreed with LBB and entered judgment in favor of IBC. In particular, the bankruptcy court found IBC maintained obligations to defend the trademarks, control the quality of goods, notify LBB of any threatened infringement of the marks, maintain full control over any infringement actions, refrain from settling any infringement action adverse to LBB’s rights under the License Agreement, refrain from suing LBB for infringement or using the marks in the relevant territories, and indemnify LBB against all claims arising out of any willful acts or omissions under IBC’s obligations. The bankruptcy court further found a number of continuing obligations on LBB’s part, including the duty to refrain from sublicensing the marks, limiting the use of the marks to the specified territories, refrain from registering the marks, executing documents to preserve the marks within the relevant territories, use the marks only as prescribed, maintain the character and quality of goods sold under the marks, notify IBC of any threatened infringement of the marks, and assist IBC in infringement litigation.
The district court affirmed, holding the License Agreement was an executory contract because a material obligation remained since the failure to maintain the character and quality of goods sold under the trademarks would constitute a material breach. In particular, the court was persuaded by section 5.2 of the License Agreement, which indicated that LBB’s failure to maintain the quality of goods sold would constitute a material breach, entitling IBC to terminate the agreement. Because the parties themselves had agreed such an obligation was material, the court concluded the License Agreement was an executory contract. The court further concluded LBB’s promissory estoppel claim failed because LBB could not show IBC unambiguously promised to sell the trademarks to LBB. The court again looked to the plain language of the License Agreement, which provided IBC retained exclusive ownership over the trademarks, and LBB had no rights to the marks. See License Agreement § 2.1. LBB appeals.[2]
*1073 II
We review a district court’s grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1168 (8th Cir. 2011). “Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.” In re Craig, 144 F.3d 593, 595 (8th Cir.1998) (citing Fed.R.Civ.P. 56(c)).
The central issue in this appeal is whether the License Agreement is an executory contract subject to assumption or rejection under section 365 of the Bankruptcy Code. “This circuit has defined an executory contract as ‘a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.’ ” Id. at 596 (quoting Nw. Airlines, Inc. v. Klinger (In re Knutson), 563 F.2d 916, 917 (8th Cir.1977)); see also Yern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973). This definition, known as the Countryman test, recognizes that, “[i]n the context of the Bankruptcy Act, ... the term ‘executory contract’ takes on a more limited meaning in light of the purposes for which the trustee is given the option to assume or reject.” Jenson v. Cont’l Fin. Corp., 591 F.2d 477, 481 (8th Cir.1979). Under the Countryman test, “a contract to which the nonbankrupt party has [f]ully rendered its performance, but the bankrupt has performed partially or not at all, is not ‘exec-utory’ in the sense of the Bankruptcy Act.” Id. at 481 n. 5.
The parties’ dispute over whether the License Agreement is an executory contract is similar in many respects to a case considered by the Third Circuit, In re Exide Technologies, 607 F.3d 957 (3d Cir. 2010). There, the court considered whether an agreement between two companies for the sale of an industrial battery business was an executory contract. Id. at 960. The companies, Exide and EnerSys, entered over twenty-three agreements to complete the sale, including four agreements the parties agreed were integrated — a license agreement, asset purchase agreement, administrative services agreement, and letter agreement. Id. at 960-61. Under the integrated agreement, Ex-ide licensed its trademark to EnerSys for use in the industrial battery business, while it continued to use the mark outside that business. Id. at 961. The agreement provided a “perpetual, exclusive, royalty-free license to use the Exide trademark in the industrial battery business.” Id. This agreement continued almost a decade without incident, until, among other events, Exide filed for bankruptcy and rejected the agreement. Id.
After reciting the Countryman test, the Third Circuit analyzed whether the agreement contained at least one obligation that would constitute a material breach if not performed. Id. at 962. Considering relevant state law, the court noted “when a breaching party has substantially performed before breaching, the other party’s performance is not excused.” Id. at 962-63 (internal quotation marks and citation omitted). The court concluded EnerSys had substantially performed to the extent that it outweighed its remaining performance, by taking such steps as paying the full purchase price, operating under the agreement for over ten years, using all the assets transferred under the agreement, and assuming Exide’s liabilities. Id. at 963. Notably, the court concluded “Ener-Sys’s obligation to observe the Quality Standards Provision is minor because it requires meeting the standards of the mark for each battery produced; it does *1074 not relate to the transfer of the industrial battery business.” Id. at 964. Moreover, the court noted EnerSys was not provided with, nor did the parties even discuss, any quality standards, and thus it was “an untenable proposition to find an obligation to go to the very root of the parties’ Agreement when the parties themselves act as if they did not know of its existence.” Id.
Relying on In re Exide, LBB contends the License Agreement is not an executory contract under the Countryman test because each party substantially performed its obligations, leaving no further material duties. LBB argues the License Agreement was part of an integrated agreement wherein IBC sold certain business operations to LBB with a perpetual, royalty-free, assignable, transferable, exclusive license to use the trademarks necessary to run the transferred businesses. Indeed, LBB claims IBC’s own records demonstrate it treated the transaction as a complete sale, and the parties have acted accordingly for fourteen years. LBB asserts the core purpose of the antitrust judgment, from which the transaction came about, was to remove IBC from involvement in the divested business, and if IBC still controlled the trademarks in these territories, the antitrust and competition requirements of the judgment would be meaningless. Any of the remaining obligations cited by the bankruptcy court here were minor or were only conditional duties, LBB claims, such as the duties in possible infringement actions involving the trademarks. As for the quality obligation cited by the district court, LBB contends the provision is vague and has no specificity to measure performance.
To begin our analysis, we must first inquire whether an executory contract is determined according to federal or state law. We find instructive our decision in Cameron v. Pfaff Plumbing & Heating, Inc., 966 F.2d 414 (8th Cir.1992), where this court concluded the Countryman test “is a question of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish uniform Laws on the subject of Bankruptcies throughout the United States.” Id. at 416 (internal quotation marks and citation omitted). At the same time, Cameron “acknowledge[d] the relevance of state law which addresses whether a particular type of contract is executory.” Id. at 416 n. I.[3]
In light of Cameron’s recognition of the continued relevance of state law in the executory contract determination, we conclude the district court properly considered the parties’ agreement on materiality in making its determination. Section 5.2 of the License Agreement provides, “[a] material breach shall include but not be limited to a failure of LBB to maintain the character and quality of goods sold under the Trademarks as provided for in Section 6.1 hereof.” Section 6.1 states:
Goods sold or otherwise distributed by Licensee under the Trademarks shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks and such present character and quality shall be considered an acceptable standard of quality. Licensee shall use raw materials, ingredients and packaging supplies of a quality at least as high and consistent with the quality previously used by IBC in connection with the same or similar products.
*1075 Sections 5.2 and 6.1 of the License Agreement, among other facts, plainly distinguish this case from In re Exide, the seminal case LBB relies upon. In that case, the parties had not even contemplated or discussed any quality standards, so the court refused to import such an obligation into the agreement and thereafter conclude the obligation was material. Here, it cannot be argued the parties did not contemplate any quality standards, as it is an explicit provision of the License Agreement. Moreover, the plain language of the agreement provides a breach of the quality provision would be material. While our inquiry is broader than simply pointing to this agreement, under Cameron, this agreement is clearly relevant to our determination.
LBB’s arguments to the contrary are essentially calls to void the quality provision for vagueness. However, as the district court recognized, our focus is not on the standards LBB must abide by to remain in compliance with the quality control provision, much less the frequency with which IBC has monitored the quality of goods over the years. Rather, our determination centers on whether any material obligations remain. Because LBB’s breach of the provision would be material, we agree with the district court that it constitutes a remaining material obligation.
Moreover, IBC maintains existing material obligations on its part as well. Namely, IBC has unperformed obligations of notice and forbearance with regard to the trademarks. See In re Qintex Entm’t, Inc., 950 F.2d 1492, 1495 (9th Cir.1991) (discussing executory contracts involving notice and forbearance); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1045 (4th Cir.1985) (“The unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory as to [the defendant].”). IBC also has obligations relating to maintaining and defending the marks, and other infringement-related obligations. See In re Qintex Entm’t, Inc., 950 F.2d at 1495 (concluding a contract was executory where the party had to “refrain from selling the rights to subdis-tribute the movies to third parties, ... indemnify and defend Qintex, and exercise! ] creative control over the colorization and marketing of the pictures.”); Lubrizol Enters., Inc., 756 F.2d at 1045 (discussing obligations of defending infringement suits and indemnification). Reading § 365 broadly, we conclude these obligations are material, thus rendering the agreement ex-ecutory as to IBC. See Cameron, 966 F.2d at 417 (“We are inclined to interpret § 365 broadly, at least in a debtor’s behalf.”) (internal quotation marks and citation omitted).
In sum, both parties maintain at least one remaining material obligation. Thus, the district court correctly concluded the agreement constitutes an executory contract.
We further reject LBB’s promissory estoppel argument. “To establish a [promissory estoppel] claim, the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiffs reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment.” Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill.2d 46, 329 Ill.Dec. 322, 906 N.E.2d 520, 523-24 (2009).
LBB claims IBC should be es-topped from contending the agreement is executory because it treated the agreement as a fully-completed sale, and it did not list the License Agreement as an asset or executory contract on its bankruptcy schedules during the first four years of its bankruptcy, while LBB continued to invest *1076 in and develop the business. However, as the district court held, LBB cannot establish the first element of its estoppel claim' — that a promise was made for the sale of the trademarks. Instead, the License Agreement speaks unequivocally of granting a license to LBB for the trademarks IBC owns, not selling the trademarks to LBB. The agreement explicitly states IBC “shall retain the full ownership interest in and to the Trademarks.” License Agreement § 2.1. Indeed, certain prohibitions and restrictions contained in the agreement would not comport with ownership by LBB. LBB’s arguments based on the parties’ course of conduct are not persuasive when faced with the plain language of the agreement. See All-Tech, Telecom, Inc. v. Amway Corp., 174 F.3d 862, 869 (7th Cir.1999) (“When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.”).
We affirm the district court.

. The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

. Interstate filed another bankruptcy petition after oral argument in this matter, triggering the automatic stay provisions of 11 U.S.C. § 362. The bankruptcy court has since approved the parties' stipulation modifying the stay to allow this court to issue a ruling in this appeal. ‘

. Cameron distinguished a seemingly conflicting case in this circuit, In re Speck, 798 F.2d 279 (8th Cir.1986), on the ground that "the holding that state law governs § 365 issues originated with an agreement to that effect by the parties in Speck," and thus Cameron limited Speck to the contracts at issue in that case. Cameron, 966 F.2d at 416 n. 1.