# United States Court of Appeals
### For the Eighth Circuit

_____

No. 11-1850
_____

In re: Interstate Bakeries Corporation,

*Debtor*,

------------------------------

Lewis Brothers Bakeries Incorporated and Chicago Baking Company,

*Appellant*,

v.

Interstate Brands Corporation,

*Appellee*,

------------------------------

United States; Federal Trade Commission,

*Amici Curiae*.

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: October 22, 2013
Filed: June 6, 2014

_____

Before RILEY, Chief Judge, WOLLMAN, LOKEN, MURPHY, BYE, SMITH, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, En Banc.

_____

COLLOTON, Circuit Judge.

Interstate Bakeries Corporation ("Interstate Bakeries") and Lewis Brothers Bakeries, Inc. ("LBB") both sought a declaratory judgment from the bankruptcy court to determine whether a license agreement between Interstate Brands Corporation ("IBC"), a subsidiary of Interstate Bakeries, and LBB was executory under 11 U.S.C. § 365(a). The bankruptcy court ruled that the agreement was executory, and the district court affirmed. Because the license agreement was part of a larger, integrated agreement that IBC has substantially performed, we reverse.

I.

In 1995, Interstate Bakeries announced its acquisition of Continental Baking Company, the owner of the Wonder and Hostess brands and trademarks. The United States Department of Justice, however, challenged the proposed acquisition as inconsistent with the antitrust laws. *United States v. Interstate Bakeries Corp. & Cont'l Baking Co.*, No. 95-C-4194, 1995 WL 803559 (N.D. Ill. Aug. 7, 1995). In January 1996, the United States District Court for the Northern District of Illinois entered a final judgment to resolve the antitrust dispute. The judgment required Interstate Bakeries

> to grant to one or more purchasers a perpetual, royalty-free, assignable, transferable, exclusive license to use the Relevant Labels to produce (or have produced for it) and sell White Pan Bread in the Relevant Territories, together with such Bread Assets as are reasonably necessary in order for the acquirer . . . to remain a viable competitor in the White Pan Bread market in each Relevant Territory.

-2-

*Id.* at *3. The "Bread Assets" included various plants, land, buildings, fixtures, machinery, equipment, vehicles, route books, customer lists, and other records used in the distribution of the brands. *Id.* at *1–2.

The 1996 judgment called for Interstate Bakeries to divest itself of at least one of its Labels in each of four territories: (1) Eastern Wisconsin, (2) Chicago, (3) Central Illinois, and (4) Southern California. *Id.* at *2–3. The Labels at issue included Wonder, Mrs. Karl's, Butternut, Sunbeam, and Weber's. *Id.* The judgment defined "Label" to encompass, *inter alia*, "all legal rights associated with a brand's trademarks, trade names, copyrights, designs, and trade dress." *Id.* at *2.

In December 1996, pursuant to the 1996 judgment, IBC entered into an agreement to sell its Butternut bread operations and assets in the Chicago territory and its Sunbeam bread operations and assets in the Central Illinois territory to LBB. To effect this transfer, IBC and LBB entered into two agreements: an Asset Purchase Agreement and a License Agreement. The Asset Purchase Agreement provided for the transfer to LBB of tangible assets and "the perpetual, royalty-free, assignable, transferable exclusive license to use the trademarks . . . pursuant to the terms of the License Agreement." The License Agreement provided that for "a fee of ten dollars ($10.00), and other good and valuable consideration, set forth in the Allocation Agreement described in Section 2.3 of the Purchase Agreement," "IBC grants to [LBB] . . . [a] license to use the Chicago Trademarks." Of the $20 million purchase price, the parties agreed to allocate $8.12 million to the intangible assets, including the trademark licenses, and the remaining $11.88 million to the various tangible assets.

The License Agreement defined the "Chicago Trademarks" as thirteen marks: Butternut, Butternut Design, Mrs. Karl's, Gingham Design, Country Wheat, Blue Seal, Home Style, Honey Wheat, Old World, Dixie Rye, Hearty Rye, Fun Buns, and Sun Maid Raisin. The agreement provided mutual duties of notification regarding

-3-

any infringement of the rights under the marks.  It also required that the goods sold under the marks be of the same character and quality as those sold by IBC at the time of the agreement, and provided that LBB's failure to maintain such quality would constitute a material breach of the agreement.

In September 2004, Interstate Bakeries and eight of its subsidiaries and affiliates, including IBC, filed voluntary bankruptcy petitions under Chapter 11.  *See In re Interstate Bakeries Corp.*, No. 04–45814, 2010 WL 2332142 (Bankr. W.D. Mo. June 4, 2010) (*Interstate Bakeries I*).  In November 2008, Interstate Bakeries first disclosed the existence of the License Agreement, as part of an amended plan of reorganization. *Id*. at *1.  Interstate Bakeries identified the agreement as an executory contract that it intended to assume as part of its plan of reorganization.  *Id*.

In December 2008, LBB filed an adversary complaint, seeking a declaratory judgment that the License Agreement is not an executory contract under 11 U.S.C. § 365 and is therefore not subject to assumption or rejection by the debtor.  Interstate Bakeries countered by moving to reject the License Agreement and seeking a declaration that it is an executory contract.  Both parties moved for summary judgment.  Before the bankruptcy court could rule, Interstate Bakeries withdrew its motion to reject the License Agreement, reinstated its request to assume the License Agreement, and reiterated its request for a declaration that the License Agreement is an executory contract.

The bankruptcy court, looking solely to the License Agreement, found that both IBC and LBB had material, outstanding obligations.  Relying on what it called the "seminal case" from a Delaware bankruptcy court in *In re Exide Techs.*, 340 B.R. 222 (Bankr. D. Del. 2006), *appeal denied, judgment aff'd*, No. 06–302–SLR, 2008 WL 522516 (D. Del. Feb. 27, 2008), *vacated and remanded*, 607 F.3d 957 (3d Cir. 2010), the court concluded that "[t]he existence of all of these material, unperformed (or continuing) obligations leads the Court to the inescapable conclusion that the License

[Agreement] is executory and, therefore, subject to assumption under 11 U.S.C. § 365." *Interstate Bakeries I*, 2010 WL 2332142, at *7.

LBB appealed to the district court pursuant to 28 U.S.C. § 158(a)(1), and the district court affirmed the bankruptcy court. *In re Interstate Bakeries Corp*., 447 B.R. 879 (W.D. Mo. 2011) (*Interstate Bakeries II*). Also looking solely to the License Agreement, the district court reasoned that LBB's "failure to maintain the character and quality of goods sold under the Trademarks would constitute a material breach of the License Agreement, thus a material obligation remains under the License Agreement, and it is an executory contract." *Id*. at 880.

LBB appealed to this court. While the appeal was pending, Interstate Bakeries changed its name to Hostess Brands, Inc. Hostess Brands filed a bankruptcy petition in the Southern District of New York in January 2012, and the New York bankruptcy court in November 2012 granted Hostess Brands authority to wind down its business.

In the meantime, in August 2012, a divided panel of this court affirmed the district court. *In re Interstate Bakeries Corp*., 690 F.3d 1069 (8th Cir. 2012) (*Interstate Bakeries III*). The full court, after receiving the views of the Antitrust Division of the Department of Justice and the Federal Trade Commission, granted LBB's petition for rehearing en banc.[1]

---

[1]In response to this court's invitation to express views, the Antitrust Division and the Federal Trade Commission as *amici curiae* registered concern that allowing Interstate Bakeries to reject the License Agreement in bankruptcy as an executory contract would thwart the remedial purpose of the 1996 antitrust decree. The *amici* urged that "[a] contract implementing the divestiture mandate of a public antitrust decree is indistinguishable from the decree itself for purposes of Section 365(a)," and maintained that § 365(a) "cannot reasonably be interpreted to permit antitrust defendants freely to terminate such remedies." Because we conclude below that the contract between IBC and LBB is not executory, we need not address the *amici*'s contention that the License Agreement "has the force of law separate and apart from

II.

A.

Before considering the merits, we must address IBC's contention that events occurring after entry of the district court's judgment have rendered the case moot. IBC informed this court that on July 19, 2013, pursuant to the New York bankruptcy proceeding, the company sold its Butternut Assets—including the Butternut brand, marks incorporating the term "butternut," the Gingham Design, and the Butternut Country White brand—to an affiliate of Flowers Foods, Inc., an unrelated third party. The sale to the Flowers Foods affiliate was made "subject to such rights and interests (if any) of LBB."

IBC says the appeal is moot because "the opportunity for IBC to realize any value from rejection of the License Agreement has now passed because IBC no longer owns the Butternut trademarks." This argument fails because IBC acknowledges that it "still owns four of the twelve trademarks that are the subject of the License Agreement." Although the Butternut trademarks may well be the most significant of the assets governed by the License Agreement with LBB, a decision in this case will still affect the rights of IBC and LBB with respect to the four remaining marks owned by IBC and covered by the License Agreement.

IBC suggests alternatively that there is no live case or controversy because it has waived any right to reject the License Agreement in bankruptcy. In its motion to dismiss the case as moot, IBC stated that it "has no reason to, and hereby acknowledges that it will not, seek rejection of the License Agreement under Section 365 of the Bankruptcy Code." The carefully worded acknowledgment, however, does not address the precise dispute in this case: whether the bankruptcy court correctly

contract law."

determined that the License Agreement is *executory*. There is still a live controversy on that question. A declaration that the License Agreement is not executory—regardless of whether IBC would assume or reject the agreement in bankruptcy—would affect the value of LBB's exclusive, perpetual, royalty-free license by removing uncertainty about the status of the License Agreement. A judgment in favor of LBB also would allow the company to plan its ongoing business without the potential that Flowers Foods or any other successor or assign of IBC could reject the License Agreement in a later bankruptcy proceeding.

Unlike the situation in *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013), where a covenant not to sue made it absolutely clear that allegedly unlawful activity could not reasonably be expected to recur, IBC has not given ironclad assurances about the License Agreement. Especially in light of the lengthy and ongoing dispute between the parties over the status of the License Agreement, the record does not foreclose a reasonable possibility that IBC or its successors or assigns who own the marks will maintain that the agreement is executory. IBC's purported waiver is not comparable to the agreement in *Already*, which bound not only the complainant but also its parents, subsidiaries, licensees, assigns, other related business entities, as well as any of their predecessors or successors in interest. *See* J.A. 96a–97a, *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013) (No. 11–982), 2012 WL 3602217, at *96a–97a. We thus conclude that IBC has not met its "formidable burden" to show "that it is 'absolutely clear' that the allegedly unlawful activity cannot reasonably be expected to recur." *Already*, 133 S. Ct. at 727–29. Effective relief on LBB's request is still available, despite IBC's pledge about its own intentions concerning rejection of the License Agreement. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The appeal is not moot, and we will proceed to the merits.

B.

The issue on the merits is whether the agreement between IBC and LBB is an executory contract under 11 U.S.C. § 365(a). The goal of Chapter 11 of the Bankruptcy Code is "the ultimate rehabilitation of the debtor." *Nicholas v. United States*, 384 U.S. 678, 687 (1966). In furtherance of that goal, § 365(a) permits a debtor-in-possession, "subject to the court's approval," to "assume or reject any executory contract or unexpired lease of the debtor." If the debtor-in-possession assumes a contract, it assumes the contract *cum onere*, continuing both to receive the benefits of and perform its obligations under the contract. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531–32 (1984); *In re Shangra-La, Inc.*, 167 F.3d 843, 849 (4th Cir. 1999). If, on the other hand, the debtor-in-possession rejects a contract, § 365(g) provides that the rejection "constitutes a breach of such contract." Rejection "frees the estate from the obligation to perform" under the contract by converting the debtor's unfulfilled obligations to damages. *Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012) (internal quotations omitted).

To determine whether the License Agreement is executory, we must first identify what constitutes the agreement at issue. In December 1996, the parties entered into an Asset Purchase Agreement that transferred IBC's Butternut Bread and Sunbeam Bread business operations and assets in two territories to LBB, and a License Agreement that authorized LBB to use IBC's trademarks in those territories under a perpetual, royalty-free, and exclusive license. The bankruptcy court and the district court focused on the License Agreement standing alone. We think the proper analysis must consider an integrated agreement that includes both the Asset Purchase Agreement and the License Agreement.

Under Illinois law, the question whether a contract like the License Agreement is a separate agreement "depends on the intention of the parties as manifested by the specific contract terms." *Stratemeyer v. West*, 484 N.E.2d 399, 400 (Ill. App. Ct.

1985).  "The general rule is that in the absence of evidence of a contrary intention, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together . . . because they are, in the eyes of the law, one contract."  *Tepfer v. Deerfield Sav. & Loan Ass'n*, 454 N.E.2d 676, 679 (Ill. App. Ct. 1983); *see Kel–Keef Enters., Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 538 (Ill. App. Ct. 2000).  "A contract should be treated as entire when, by a consideration of its terms, nature, and purposes, each and all of the parts appear to be interdependent and common to one another and to the consideration."  *Trapkus v. Edstrom's Inc.*, 489 N.E.2d 340, 346 (Ill. App. Ct. 1986).

Applying these principles, the Asset Purchase Agreement and the License Agreement should be considered together as one contract.  IBC and LBB entered into the Asset Purchase Agreement and the License Agreement contemporaneously on December 28, 1996.  The Asset Purchase Agreement lists the license as an asset sold to LBB pursuant to the sale.  It directs the parties to enter into the License Agreement "[u]pon the terms and subject to the conditions contained in [the Asset Purchase Agreement]."  Both documents memorializing the agreements define the "Entire Agreement" as including both agreements.  The Asset Purchase Agreement's definition includes "the exhibits and schedules hereto," and a model for the License Agreement is included as an exhibit to the Asset Purchase Agreement.  The License Agreement defines the entire agreement to include "the Exhibits and Schedules hereto and the agreements referenced herein," and it references the Asset Purchase Agreement throughout the agreement.  The License Agreement states that as consideration for the license, LBB "has paid to IBC a fee of ten dollars ($10.00), and other good and valuable consideration, set forth in the Allocation Agreement described in Section 2.3 of the Purchase Agreement."  To treat the License Agreement as a separate agreement would run counter to the plain language of both the Asset Purchase Agreement and the License Agreement, which describe the two as one piece, and would ignore the valuable consideration paid for the license.

The ultimate question, then, is whether this integrated agreement is an executory contract under the Bankruptcy Code. This circuit has adopted Professor Countryman's definition of an executory contract for purposes of the Bankruptcy Code: "[A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Craig*, 144 F.3d 593, 596 (8th Cir. 1998) (internal quotation omitted); *see* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

The parties dispute whether we should apply the doctrine of substantial performance in determining whether the contract is executory. Under this doctrine, the nonbreaching party's performance is not excused if the breaching party has "substantially performed." *In re Exide*, 607 F.3d at 963. According to IBC, the doctrine does not apply, and we should look only at the remaining obligations on each side and ignore the obligations that the parties have already performed.

The doctrine of substantial performance, however, is inherent in the Countryman definition of executory contract. Substantial performance and material breach are interrelated concepts: "Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused." 15 Richard A. Lord, *Williston on Contracts* § 44:55 (4th ed. 2000). Consistent with that interrelationship, the Countryman definition calls for the court to examine whether the obligations of the parties to the contract "are so far unperformed" that a failure to complete performance would be a material breach. *In re Craig*, 144 F.3d at 596. This inquiry requires a comparison of the performed obligations with the unperformed obligations. For example, when a nonbankrupt building contractor has "fully performed save that he has failed to connect the water or has made a defective connection," the bankrupt

-10-

party on the other side of the contract would be entitled to damages, but not to refuse acceptance of the building or to excuse his performance. Countryman, *supra*, 57 Minn. L. Rev. at 457. That is so, because the building contractor has substantially performed.

IBC argues that this court must look to state law in applying the Countryman definition, and that the doctrine of substantial performance would not apply under Illinois law. *But cf. Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir. 1992) (holding that whether a contract is executory under § 365 "is a question of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish 'uniform Laws on the subject of Bankruptcies throughout the United States'") (quoting U.S. Const. art. I, § 8, cl. 4). Assuming that state law applies, Illinois does recognize the doctrine of substantial performance, and Illinois law defines it as "performance in all the essential elements necessary to the accomplishment of the purpose of the contract." *W.E. Erickson Constr., Inc. v. Congress–Kenilworth Corp.*, 503 N.E.2d 233, 236–37 (Ill. 1986) (internal quotation omitted). IBC argues that Illinois limits this doctrine to disputes under construction contracts, but IBC cites no case so holding. Just as the Third Circuit saw no reason to cabin the rule under New York law in *In re Exide*, 607 F.3d at 964, we are not convinced that Illinois law limits consideration of the doctrine of substantial performance to construction cases.

To conclude that a contract is executory for purposes of § 365, the bankruptcy court must find that *both* parties have so far underperformed that a failure of *either* to complete performance would constitute a material breach excusing the performance of the other. *In re Craig*, 144 F.3d at 596. When the bankruptcy court reasoned that IBC's remaining obligations were material, that court rested its conclusion on the "factually analogous," but now-reversed, decision of the Delaware bankruptcy court in *In re Exide*. *See Interstate Bakeries I*, 2010 WL 2332142, at *6 (citing *In re Exide*, 340 B.R. at 227–37). The district court then affirmed the

-11-

bankruptcy court, but it did so after concluding that the remaining obligations of only *one party*, LBB, were material. *Interstate Bakeries II*, 447 B.R. at 884–86.

We conclude that the contract at issue here is not executory, because IBC substantially performed its obligations under the Asset Purchase Agreement and License Agreement, and its failure to perform any of its remaining obligations would not be a material breach of the integrated agreement. Material breaches are those that "go[] to the root or essence of the contract." 15 *Williston on Contracts* § 44:55; *see also Anderson v. Long Grove Country Club Estates, Inc.*, 249 N.E.2d 343, 349 (Ill. App. Ct. 1969) ("A material or total breach is a failure to do an important, substantial or material undertaking set forth in a contract.").

The essence of the agreement here was the sale of IBC's Butternut bread and Sunbeam bread business operations in specific territories, not merely the licensing of IBC's trademark. The agreement called for LBB to pay $20 million for IBC's assets. The parties allocated $11.88 million for tangible assets, such as real property, machinery and equipment, computers and licensed computer software, vehicles, office equipment, and inventory. They allocated another $8.12 million toward intangible assets, including the license. IBC has transferred all of the tangible assets and inventory to LBB, executed the License Agreement, and received the full $20 million purchase price from LBB.

IBC's remaining obligations concern only one of the assets included in the sale—the license. They involve such matters as obligations of notice and forbearance with regard to the trademarks, obligations relating to maintenance and defense of the marks, and other infringement-related obligations. When considered in the context of the entire agreement, these remaining obligations are relatively minor and do not relate to the central purpose of the agreement to sell the Butternut and Sunbeam bread operations and assets to LBB in certain territories.

We find useful guidance on analogous facts in the Third Circuit's decision in *In re Exide*. At issue there was the $135 million sale of Exide's industrial battery business to EnerSys, which included a trademark license agreement. 607 F.3d at 960. Along with the license, Exide sold to EnerSys physical manufacturing plants, equipment, inventory, and certain items of intellectual property. *Id.* The Third Circuit held that Exide's remaining obligations, which included duties to maintain quality standards, to refrain from use of the trademark outside the industrial battery business, and to indemnify EnerSys, did not "outweigh the substantial performance rendered and benefits received by EnerSys." *Id*. at 963–64. The court observed that the remaining contractual obligations did not relate to the purpose of the agreement—the sale of Exide's industrial battery business—and that the trademark license agreement was therefore not executory. *Id*. at 964. For similar reasons, we conclude that the License Agreement between IBC and LBB is not executory.[2]

\*       \*       \*

The judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion. IBC's motion to dismiss the appeal as moot is denied.

---

[2]Because the agreement is not executory, we need not address whether rejection of a trademark-licensing agreement terminates the licensee's rights to use the trademark. *Compare Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985) ("Under 11 U.S.C. § 365(g), Lubrizol would be entitled to treat rejection as a breach and seek a money damages remedy; however, it could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract."), *with Sunbeam*, 686 F.3d at 376–78 (disagreeing with *Lubrizol*); *In re Exide*, 607 F.3d at 965–67 (Ambro, J., concurring) ("[A] trademark licensor's rejection of a trademark agreement under 11 U.S.C. § 365 does not necessarily deprive the trademark licensee of its rights in the licensed mark.").

-13-

BYE, Circuit Judge, with whom SMITH and KELLY, Circuit Judges, join, concurring in part and dissenting in part.

I agree the appeal is not moot. Because I disagree with the majority's conclusion IBC has substantially performed its obligations under the integrated agreement, however, I respectfully dissent from the majority's ultimate conclusion the agreement is not executory. In my view, both IBC and LBB have ongoing obligations under the integrated agreement which would result in material breaches if not performed. Accordingly, I conclude the integrated agreement is executory and would affirm.

Such disagreement with the majority results from my view that the license is of primary importance to the integrated agreement, as are the attendant ongoing obligations under the License Agreement. The majority assumes the license, as a single asset among many, plays a relatively minor role in the integrated agreement, the essence of which the majority suggests was the sale of IBC's bread businesses in the pertinent territories. The majority then reasons the ongoing obligations associated with only this single asset are relatively minor when considered in context of the sale contemplated by the entire agreement.

This is not a case, however, where merely counting the number of assets transferred conveys the full picture. Limiting our analysis so would lead us to conclude a failure to transfer the license would have been less material to the parties than a failure to transfer some other category of assets, the trays used in IBC's Chicago business for example, merely because there were multiple trays and only one license. Our analysis in this case has to also consider the relative importance of the license to the integrated agreement.

As I view it, the majority fails to acknowledge the importance of the license because it fails to first acknowledge the full purpose of the parties in entering into the

-14-

integrated agreement. The materiality of a contractual obligation depends on whether the obligation goes to the essence of the contract. See 15 Richard A. Lord, Williston on Contracts § 44:55 (4th ed. 2000). It follows that the relative importance of a particular asset and the obligations associated with such asset must also be assessed with respect to the essence of the contract. The purpose of LBB and IBC in entering into the integrated agreement here was the sale of IBC's bread business in the pertinent territories "to comply with the Final Judgment entered in the" antitrust dispute ("antitrust Final Judgment"). Appellants' Addendum A.26. The terms of the antitrust Final Judgment directed IBC to divest itself of the tangible assets reasonably necessary to allow the purchaser to make effective ongoing use of the license which IBC had agreed to divest. United States v. Interstate Bakeries Corp. & Cont'l Baking Co., No. 95-C-4194, 1995 WL 803559 at *3 (N.D. Ill. Aug. 7, 1995). In other words, the multitude of tangible assets listed in the Asset Purchase Agreement were there for the purpose of allowing LBB to make effective ongoing use of the license. Given the central character of the transfer of the license to the antitrust Final Judgment and the integrated agreement, the mere fact the license was one asset listed among many does not indicate it plays a minor role in the transaction.

Even if the parties had not drafted their agreements against the background of the antitrust Final Judgment, I would arrive at the same conclusion. The provisions of the Asset Purchase Agreement and License Agreement indicate the parties regarded the ongoing obligations associated with the license as more likely to be material than those regarding the asset purchase. To illustrate, the severability provision in the Asset Purchase Agreement indicates that, in the event a provision of such agreement would be declared invalid, the parties agreed the provision would be severable and they would continue to be bound by the remaining valid provisions. By contrast, the severability provision of the License Agreement indicates that, in the event any provision of the License Agreement would be declared invalid, either party could request renegotiation of the License Agreement if it deemed the pertinent

-15-

provision to be material. Indeed, the parties expressly designated one of LBB's ongoing duties under the License Agreement as material.

For the foregoing reasons, I conclude the license and the attendant ongoing obligations were of primary importance to the parties and their integrated agreement. We must consider the importance of these obligations when we assess whether the parties have substantially performed their obligations to determine whether the contract is executory. See 15 Williston, supra § 44:55 ("Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered[.]"). IBC and LBB each have continuing obligations under the integrated agreement. We must determine whether any of those ongoing obligations would result in a material breach if not performed. If so, the party who has the ongoing obligation cannot be said to have substantially performed.

There is no question LBB has an ongoing obligation which would result in a material breach if not performed. In section 5.2 of the License Agreement, the parties expressly indicated a failure of LBB to maintain the quality and character of the goods sold under the licensed trademarks would constitute a material breach. Accordingly, LBB cannot be said to have substantially performed.

I also conclude IBC has not substantially performed because IBC has ongoing obligations which would result in a material breach if not performed. For example, because IBC has granted LBB an exclusive license to use the pertinent trademarks in the territories mentioned in the integrated agreement, IBC has a continuing obligation to refrain from marketing its products under those trademarks in those territories. See In re Select-A-Seat Corp., 625 F.2d 290, 292 (9th Cir. 1980) ("Because of the exclusive nature of the license which Fenix received, Select-A-Seat was under a continuing obligation not to sell its software packages to other parties."); see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1045 (4th

-16-

Cir. 1985) ("The unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory as to [the defendant]."). As the purpose of the integrated agreement was to transfer IBC's bread business in the specified territories *to comply with the antitrust Final Judgment*, it cannot seriously be argued IBC would not materially breach the integrated agreement if it breached its duty to forbear from using the trademarks in those territories. In addition, IBC has other continuing obligations relating to indemnifying LBB for certain costs and expenses, and maintaining and defending the marks. See In re Qintex Entm't, Inc., 950 F.2d 1492, 1496 (9th Cir. 1991) (concluding a contract was executory where the party had ongoing duties to indemnify and defend); Lubrizol Enters., Inc., 756 F.2d at 1045 (discussing obligations of defending infringement suits and indemnification). In light of its continuing obligations of forbearance regarding the license and its other ongoing duties, IBC cannot be said to have substantially performed its obligations under the integrated agreement.

For the foregoing reasons, I respectfully dissent from section II.B. of the majority opinion.

_____