In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3920

SUNBEAM PRODUCTS, INC., doing business as
Jarden Consumer Solutions,

*Plaintiff-Appellant*,

*v.*

CHICAGO AMERICAN MANUFACTURING, LLC,

*Defendant-Appellee*.

Appeal from the United States Bankruptcy Court
for the Northern District of Illinois, Eastern Division.
No. 09 A 341—**Pamela S. Hollis**, *Judge*.

ARGUED MAY 22, 2012—DECIDED JULY 9, 2012

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Lakewood Engineering &
Manufacturing Co. made and sold a variety of con-
sumer products, which were covered by its patents and
trademarks. In 2008, losing money on every box fan,
Lakewood contracted their manufacture to Chicago

American Manufacturing (CAM). The contract authorized CAM to practice Lakewood's patents and put its trademarks on the completed fans. Lakewood was to take orders from retailers such as Sears, Walmart, and Ace Hardware; CAM would ship directly to these customers on Lakewood's instructions. Because Lakewood was in financial distress, CAM was reluctant to invest the money necessary to gear up for production—and to make about 1.2 million fans that Lakewood estimated it would require during the 2009 cooling season—without assured payment. Lakewood provided that assurance by authorizing CAM to sell the 2009 run of box fans for its own account if Lakewood did not purchase them.

In February 2009, three months into the contract, several of Lakewood's creditors filed an involuntary bankruptcy petition against it. The court appointed a trustee, who decided to sell Lakewood's business. Sunbeam Products, doing business as Jarden Consumer Solutions, bought the assets, including Lakewood's patents and trademarks. Jarden did not want the Lakewood-branded fans CAM had in inventory, nor did it want CAM to sell those fans in competition with Jarden's products. Lakewood's trustee rejected the executory portion of the CAM contract under 11 U.S.C. §365(a). When CAM continued to make and sell Lakewood-branded fans, Jarden filed this adversary action. It will receive 75% of any recovery and the trustee the other 25% for the benefit of Lakewood's creditors.

The bankruptcy judge held a trial. After determining that the Lakewood–CAM contract is ambiguous, the

judge relied on extrinsic evidence to conclude that CAM was entitled to make as many fans as Lakewood estimated it would need for the entire 2009 selling season and sell them bearing Lakewood's marks. *In re Lakewood Engineering & Manufacturing Co.*, 459 B.R. 306, 333–38 (Bankr. N.D. Ill. 2011). Jarden contends in this court—following certification by the district court of a direct appeal under 28 U.S.C. §158(d)(2)(A)—that CAM had to stop making and selling fans once Lakewood stopped having requirements for them. The bankruptcy court did not err in reading the contract as it did, but the effect of the trustee's rejection remains to be determined.

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), holds that, when an intellectual-property license is rejected in bankruptcy, the licensee loses the ability to use any licensed copyrights, trademarks, and patents. Three years after *Lubrizol*, Congress added §365(n) to the Bankruptcy Code. It allows licensees to continue using the intellectual property after rejection, provided they meet certain conditions. The bankruptcy judge held that §365(n) allowed CAM to practice Lakewood's patents when making box fans for the 2009 season. That ruling is no longer contested. But "intellectual property" is a defined term in the Bankruptcy Code: 11 U.S.C. §101(35A) provides that "intellectual property" includes patents, copyrights, and trade secrets. It does not mention trademarks. Some bankruptcy judges have inferred from the omission that Congress codified *Lubrizol* with respect to trademarks, but an omission is just an omission. The limited definition in §101(35A) means that §365(n) does

not affect trademarks one way or the other. According to the Senate committee report on the bill that included §365(n), the omission was designed to allow more time for study, not to approve *Lubrizol*. See S. Rep. No. 100–505, 100th Cong., 2d Sess. 5 (1988). See also *In re Exide Technologies*, 607 F.3d 957, 966–67 (3d Cir. 2010) (Ambro, J., concurring) (concluding that §365(n) neither codifies nor disapproves *Lubrizol* as applied to trademarks). The subject seems to have fallen off the legislative agenda, but this does not change the effect of what Congress did in 1988.

The bankruptcy judge in this case agreed with Judge Ambro that §365(n) and §101(35A) leave open the question whether rejection of an intellectual-property license ends the licensee's right to use trademarks. Without deciding whether a contract's rejection under §365(a) ends the licensee's right to use the trademarks, the judge stated that she would allow CAM, which invested substantial resources in making Lakewood-branded box fans, to continue using the Lakewood marks "on equitable grounds". 459 B.R. at 345; see also *id*. at 343–46. This led to the entry of judgment in CAM's favor, and Jarden has appealed.

What the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be "inequitable." See, e.g., *Toibb v. Radloff*, 501 U.S. 157, 162 (1991); *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004); *In re Sinclair*, 870 F.2d 1340 (7th Cir. 1989). There are hundreds of bankruptcy judges, who have many different ideas about what is equitable in any given

situation. Some may think that equity favors licensees'
reliance interests; others may believe that equity favors
the creditors, who can realize more of their claims if the
debtor can terminate IP licenses. Rights depend, how-
ever, on what the Code provides rather than on notions
of equity. Recently the Supreme Court emphasized
that arguments based on views about the purposes
behind the Code, and wise public policy, cannot be used
to supersede the Code's provisions. It remarked: "The
Bankruptcy Code standardizes an expansive (and some-
times unruly) area of law, and it is our obligation to
interpret the Code clearly and predictably using well
established principles of statutory construction." *RadLAX
Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065,
2073 (2012).

Although the bankruptcy judge's ground of decision
is untenable, that does not necessarily require reversal.
We need to determine whether *Lubrizol* correctly under-
stood §365(g), which specifies the consequences of a
rejection under §365(a). No other court of appeals has
agreed with *Lubrizol*—or for that matter disagreed with
it. *Exide*, the only other appellate case in which the
subject came up, was resolved on the ground that the
contract was not executory and therefore could not be
rejected. (*Lubrizol* has been cited in other appellate opin-
ions, none of which concerns the effect of rejection on
intellectual-property licenses.) Judge Ambro, who filed a
concurring opinion in *Exide*, concluded that, had the
contract been eligible for rejection under §365(a), the
licensee could have continued using the trademarks.
607 F.3d at 964–68. Like Judge Ambro, we too think
*Lubrizol* mistaken.

Here is the full text of §365(g):

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—
>
> > (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or
> >
> > (2) if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title—
> >
> > > (A) if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or
> > >
> > > (B) if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title—
> > >
> > > > (i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or
> > > >
> > > > (ii) at the time of such rejection, if such contract or lease was assumed after such conversion.

Most of these words don't affect our situation. Subsections (h)(2) and (i)(2) are irrelevant, and paragraph (1) tells

us that the rejection takes effect immediately before the petition's filing. For our purpose, therefore, all that matters is the opening proposition: that rejection "constitutes a breach of such contract".

Outside of bankruptcy, a licensor's breach does not terminate a licensee's right to use intellectual property. Lakewood had two principal obligations under its contract with CAM: to provide CAM with motors and cord sets (CAM was to build the rest of the fan) and to pay for the completed fans that CAM drop-shipped to retailers. Suppose that, before the bankruptcy began, Lakewood had broken its promise by failing to provide the motors. CAM might have elected to treat that breach as ending its own obligations, see Uniform Commercial Code §2–711(1), but it also could have covered in the market by purchasing motors and billed Lakewood for the extra cost. UCC §2–712. CAM had bargained for the security of being able to sell Lakewood-branded fans for its own account if Lakewood defaulted; outside of bankruptcy, Lakewood could not have ended CAM's right to sell the box fans by failing to perform its own duties, any more than a borrower could end the lender's right to collect just by declaring that the debt will not be paid.

What §365(g) does by classifying rejection as breach is establish that in bankruptcy, as outside of it, the other party's rights remain in place. After rejecting a contract, a debtor is not subject to an order of specific performance. See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *Midway Motor Lodge of Elk Grove v. Innkeepers'*

*Telemanagement & Equipment Corp.*, 54 F.3d 406, 407 (7th Cir. 1995). The debtor's unfulfilled obligations are converted to damages; when a debtor does not assume the contract before rejecting it, these damages are treated as a pre-petition obligation, which may be written down in common with other debts of the same class. But nothing about this process implies that any rights of the other contracting party have been vaporized. Consider how rejection works for leases. A lessee that enters bankruptcy may reject the lease and pay damages for abandoning the premises, but rejection does not abrogate the lease (which would absolve the debtor of the need to pay damages). Similarly a lessor that enters bankruptcy could not, by rejecting the lease, end the tenant's right to possession and thus re-acquire premises that might be rented out for a higher price. The bankrupt lessor might substitute damages for an obligation to make repairs, but not rescind the lease altogether.

Bankruptcy law does provide means for eliminating rights under some contracts. For example, contracts that entitle creditors to preferential transfers (that is, to payments exceeding the value of goods and services provided to the debtor) can be avoided under 11 U.S.C. §547, and recent payments can be recouped. A trustee has several avoiding powers. See 11 U.S.C. §§ 544–51. But Lakewood's trustee has never contended that Lakewood's contract with CAM is subject to rescission. The trustee used §365(a) rather than any of the avoiding powers—and rejection is not "the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the positions they

occupied before the contract was formed." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007). It "merely frees the estate from the obligation to perform" and "has absolutely no effect upon the contract's continued existence". *Ibid*. (internal citations omitted).

Scholars uniformly criticize *Lubrizol*, concluding that it confuses rejection with the use of an avoiding power. See, e.g., Douglas G. Baird, *Elements of Bankruptcy* 130–40 & n.10 (4th ed. 2006); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845, 916–19 (1988); Jay Lawrence Westbrook, *The Commission's Recommendations Concerning the Treatment of Bankruptcy Contracts*, 5 Am. Bankr. Inst. L. Rev. 463, 470–72 (1997). *Lubrizol* itself devoted scant attention to the question whether rejection cancels a contract, worrying instead about the right way to identify executory contracts to which the rejection power applies.

*Lubrizol* does not persuade us. This opinion, which creates a conflict among the circuits, was circulated to all active judges under Circuit Rule 40(e). No judge favored a hearing *en banc*. Because the trustee's rejection of Lakewood's contract with CAM did not abrogate CAM's contractual rights, this adversary proceeding properly ended with a judgment in CAM's favor.

AFFIRMED