KAYATTA, Circuit Judge. Generally speaking, when a company files for protection under Chapter 11 of the Bankruptcy Code, the trustee or the debt- or-in-possession may secure court approval to “reject” any executory contract of the debtor, meaning that the other party to the contract is left with a damages claim for breach, but not the ability to compel further performance. 11 U.S.C. §§ 365(a), 1107(a); see NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531-32, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); Mason v. Official Comm. of Unsecured Creditors, for FBI Distrib. Corp. & FBC Distrib. Corp. (In re FBI Distrib. Corp.), 330 F.3d 36, 43-44 (1st Cir. 2003). When the rejected contract, however, is one “under which the debtor is a licensor of a right to intellectual property,” the licensee may elect to “retain its rights ... to such intellectual property,” thereby continuing the debtor’s duty to license the intellectual property. 11 U.S.C. § 365(n)(l).' In this case, Tempnology, LLC (“Debtor”)—a debtor-in-possession seeking to reorganize under Chapter 11— rejected an agreement giving certain marketing and distribution rights to Mission Product Holdings, Inc. The parties agree that Mission can insist that the rejection not apply to nonexclusive patent licenses contained in the rejected agreement. They disagree as to whether the rejection applies to the agreement’s grants of a trademark license and of exclusive rights to sell certain of Debtor’s goods. In the case of the trademark license, resolving that disagreement poses for this circuit an issue of first impression concerning which other circuits are split. For the following reasons, we agree with the bankruptcy court that the rejection left Mission with only a pre-petition damages claim in lieu of any obligation by Debtor to further perform under either the trademark license or the grant of exclusive distribution rights. I. Debtor made specialized products—such as towels, socks, headbands, and other accessories—designed to remain at low temperatures even when used during exercise, which it marketed under the “Cool-core” and “Dr. Cool” brands. A significant intellectual property portfolio supported Debtor’s products. This portfolio consisted of two issued patents, four pending patents, research studies, and a. multitude of registered and pending trademarks. On November 21, 2012, Mission and Debtor executed a Co-Marketing and Distribution Agreement, which serves as the focal point of this appeal. The Agreement provided Mission with three relevant categories of rights. First, Debtor granted Mission distribution rights to certain of its manufactured products within the United States.[1] These products, called “Cooling Accessories,” were defined in the Agreement as “products of the specific types listed on Exhibit A” and “manufactured by or on behalf of [Debtor].” They also included “additional products that are hereafter developed by [Debtor].” Exhibit A broke down the thirteen listed products into two categories: “Exclusive” and “Non-Exclusive” Cooling Accessories. For “Exclusive Cooling Accessories”—comprised of towels, wraps, hoodies, bandanas, multi-chills, and doo rags—Debtor agreed that “it -will not license or sell” the products “to anyone other than [Mission] during the Term.” Mission’s rights with respect to the remaining Cooling Accessories—comprised of socks, headbands, wristbands, sleeves, skullcaps, yoga mats, and baselayers— were nonexclusive because Debtor reserved for itself the “right to sell ... to vertically integrated companies as well as customers that are not Sports Distributors or retailers in the Sporting Channel.” Second, Debtor granted Mission a nonexclusive license to Debtor’s intellectual property. This “non-exclusive, irrevocable, royalty-free, fully paid-up, perpetual, worldwide, fully-transferable license” granted Mission the right “to sublicen^e (through multiple tiers), use, reproduce, modify, and create derivative work based on and otherwise freely exploit” Debtor’s products—including Cooling Accessories— and its intellectual property. This irrevocable license, however, expressly excluded any rights to Debtor’s trademarks. Trademarks were the subject of the third bucket of rights. Section 15(d) of the Agreement granted Mission a “nonexclusive, non-transferable, limited license” for the term of the Agreement “to use [Debt- or’s] trademark and logo (as well as any other Marks licensed hereunder) for the limited purpose of performing its obligations hereunder, exercising its rights and promoting the purposes of this Agreement.” This license came with limitations. Mission was forbidden from using the trademarks in a manner that was disparaging, inaccurate, or otherwise inconsistent ■with the terms of the Agreement. Further, Mission was required to “comply with any written trademark guidelines” and Debtor had “the right to review and approve all uses of its Marks,” except for certain pre-approved uses. The Agreement also included a provision permitting either party to terminate the Agreement without cause. On June 30, 2014, Mission exercised this option, triggering a “Wind-Down Period” of approximately two years. Debtor, in turn, issued a notice of immediate termination for cause on July 22, 2014, claiming that Mission’s hiring of Debtor’s former president violated the Agreement’s restrictive covenants. Pursuant to the Agreement’s terms, Mission’s challenge to Debtor’s immediate termination for cause went before an arbitrator. The arbitrator determined that Debtor had waived any grounds for immediate termination under the restrictive covenant and that the Agreement remained in effect until the expiration of the Wind-Down Period. That ruling meant that Mission was contractually entitled to retain its distribution and trademark rights until July 1, 2016, and its nonexclusive intellectual property rights in perpetuity. Intervening events, however, put an earlier end to the parties’ contractual relationship. Although Debtor posted profits in 2012, its financial outlook dimmed. After accruing'multi-million dollar net operating losses in 2013 and 2014, Debtor filed a voluntary petition for Chapter 11 bankruptcy on September 1, 2015. The following day, Debtor moved to reject seventeen of its contracts, including the Agreement, pursuant to 11 U.S.C. § 365(a). Section 365(a) permits a debtor-in-possession,[2] with the court’s approval, to “reject any executory contract” that, in the debtor’s business- judgment, is not beneficial to the company. See Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.), 476 F.3d 665, 669-71 (9th Cir. 2007); see also Bildisco & Bildisco, 465 U.S. at 520, 523, 104 S.Ct. 1188. In its memoranda supporting its motion, Debtor informed the bankruptcy court that it sought to reject the Agreement because it hindered Debtor’s ability to derive revenue from other marketing and distribution opportunities. Debtor faulted Mission—and particularly the Agreement’s grant of exclusive distribution rights—for its bankruptcy. It alleged that the Agreement “suffocated the Debtor’s ability to market and distribute its products” after Mission failed to fulfill its obligations, “essentially starving the Debtor from any income.” Mission objected to the rejection motion, arguing that 11 U.S.C. § 365(n) allowed Mission to retain both its intellectual property license and its -exclusive distribution rights. Section 365(n) provides an exception from section 365(a)’s broad rejection authority by limiting-the debtor-in-possession’s ability to terminate intellectual property licenses it has granted to other parties. On September 21, 2015, the bankruptcy court granted Debtor’s motion to- reject certain executory contracts, except for the Agreement, for which it ordered further hearing.' In a subsequent one-sentence order, the bankruptcy court granted the motion to reject the Agreement, “subject to Mission Product Holdings’s election to preserve its rights under 11 U.S.C. § 365(n).” Debtor then moved for a determination of the applicability and scope of Mission’s rights under section 365(n). In that motion, Debtor conceded that Mission retained its nonexclusive, perpetual license to certain of Debtor’s intellectual properties—which did not include its trademarks—but argued that section 365(n) did not cover either Mission’s exclusive distribution rights or the trademark license. Mission again objected, arguing that the relief Debtor requested required an adversary proceeding pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. After holding a nontestimonial hearing, the bankruptcy court concluded that Mission’s election pursuant to section 365(n) did not preserve either the exclusive distribution rights or the trademark license. The court found that section 365(n) only protected intellectual property rights, and Mission’s exclusive distributorship could not, fairly be characterized as, such. With respect to trademarks, the court reasoned that Congress’s decision to leave trademarks off the definitional list of intellectual properties in 11 U.S.C, § 101(35A) left the trademark license unprotected from rejection. Finally, the court rejected Mission’s argument that the Bankruptcy Code required an adversary proceeding to'determine the issue.' The court viewed “the Motion in the context' of rejection under § 365, which is a contested matter under Fed. R. Bankr. P. 9014.” Mission appealed to the Bankruptcy Appellate Panel for the First’Circuit (“BAP”). The BAP affirmed the bankruptcy court’s order with respect to Mission’s exclusive distribution' rights, concluding that “Mission’s attempt to re-characterize its exclusive product distribution rights under the Agreement as an intellectual property license [is] unsupported by either the letter or the spirit of the Agreement,” Like the bankruptcy court, the BAP read section 365(n)’s protection of “exclusivity provision[s]” as encompassing only the exclusivity attributes, such as they might be, of intellectual property rights. The BAP also affirmed the bankruptcy .court’s determination that the section 365(n) motion did not require Debtor to commence an adversary .proceeding under Bankruptcy Rule 7001. Regarding trademarks, however, the BAP diverged from the bankruptcy court. Although the BAP agreed that section 365(n) failed to protect Mission’s rights to Debtor’s trademarks, it disagreed as to the effect of that conclusion. Rather than finding that rejection extinguished the non-debtor’s rights, the BAP followed the Seventh Circuit’s ruling in Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC, 686 F.3d 372 (7th Cir. 2012). The BAP held that, because section 365(g) deems the effect of rejection to be a breach of contract, and a licensor’s breach of a trademark agreement outside- the bankruptcy context does not necessarily terminate the licensee’s rights, rejection under section 365(g) likewise does not necessarily eliminate those rights. Thus, the BAP reversed the bankruptcy court’s determination that Mission no longer had protectable rights in Debtor’s trademarks and trade names. This appeal ensued. We affirm the bankruptcy court’s determinations! We conclude that section 365(n) does not apply to Mission’s right to be the exclusive distributor of Debtor’s products, or to its trademark license. Unlike the BAP and the Seventh Circuit, we' also hold that Mission’s right to use Debtor’s trademarks did not otherwise survive rejection of the Agreement. II. On appeal from a decision by' the BAP, “[w]e accord no special deference to determinations made by the [BAP],” and instead “train the lens of our inquiry directly on the bankruptcy court’s decision.”[3] Wheeling & Lake Erie Ry. Co. v. Reach (In re Montreal, Maine & Atl. Ry., Ltd.), 799 F.3d 1, 5 (1st Cir. 2015), In doing so, we review the bankruptcy court’s factual findings for clear error and its conclusions of law de novo. DeGiacomo v. Traverse (In re Traverse), 753 F.3d 19, 24 (1st Cir. 2014). HI. We begin with the statutory framework that defines the scope of Debt- or’s ability, “subject to the court’s approval,” to “assume or reject any executory contract or unexpired lease of the debtor.’? 11 U.S.C. § 365(a). Executory contracts, although not- defined in the Bankruptcy Code, are generally considered to be contracts “on which performance is due to some extent on both sides.” In re FBI Distrib. Corp., 330 F.3d at 40 n.5 (quoting Bildisco & Bildisco, 465 U.S. at 522 n.6, 104 S.Ct. 1188); see also Parkview Adventist Med. Ctr. v. United States ex rel. Dep’t of Health & Human Servs., 842 F.3d 757, 763 n.12 (1st Cir. 2016). Section 365(a) permits the debtor-in-possession to assume those contracts that are beneficial and reject those that may hinder its recovery. In re FBI Distrib. Corp., 330 F.3d at 42. It provides an “elixir for use in nursing a business back to good health” by allowing the trustee or debtor-in-possession to “prescribe it as an emetic to purge the bankruptcy estate of obligations that promise to hinder a reorganization.” Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.), 67 F.3d 1021, 1024 (1st Cir. 1995). Section 365(a) thus furthers Chapter U’s “paramount objective” of rehabilitating debtors, In re FBI Distrib. Corp., 330 F.3d at 41. In lieu of the rejected obligation, a debtor is left with a liability for what the Code deems to be a pre-petition breach of the contract. 11 U.S.C. § 365(g) (“[T]he rejection of an ex-ecutory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ... immediately before the date of the filing of the petition.... ”). In 1985, the Fourth Circuit was tasked with applying this framework to an intellectual property license granted by a debt- or. See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985). The Fourth Circuit held that the term “executory contract” in section 365(a) encompassed intellectual property licenses, id. at 1045, and that under section 365(g) the effect of rejection was to terminate an intellectual property license, id. at 1048. The court based its reasoning on what it saw as the animating principles behind section 365(g), thus distinguishing “statutory breach” from common law breach: Even though § 365(g) treats rejection as breach, the legislative history of § 365(g) makes clear that the purpose of the provision is to provide only a damages remedy for the non-bankrupt party.... [T]he statutory “breach” contemplated by § 365(g) controls, and provides only a money damages remedy for the non-bankrupt party. ... Allowing specific performance would obviously undercut the core purpose of rejection under § 365(a), Id. Three years later, Congress responded. Rather than amending either section 365(a) or section 365(g), Congress enacted a brand new section 365(n). See S. Rep. No. 100-505, at 8 (1988). Section 365(n)(Z) gives to a licensee of intellectual property rights a choice between treating the license as terminated and asserting a claim for pre-petition damages—a remedy the licensee held already under section 365(g)—or retaining its intellectual property rights under the license. It states, in full: If the trustee rejects an executory contract under which the debtor is a li-censor of a right to intellectual property, the licensee under such contract may elect— (A) to treat such contract as terminated by such rejection, if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable non-bankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for— (i) the duration of such contract; and (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law. 11 U.S.C. § 365(n)(l). Congress also amended the definition of intellectual property, thus defining the scope of the new section 365(n)(l). Under 11 U.S.C. § 10K35A), The term “intellectual property” means— (A) trade secret; (B) invention, process, design, or plant protected under title 35; (C) patent application; (D) plant variety; (E) work of authorship protected under title 17; or (F) mask work protected under chapter 9 of title 17; to the extent protected by applicable nonbankruptcy law. IY. With the foregoing framework in mind, we turn now to Mission’s arguments on appeal. We consider first its contention that its exclusive distribution rights remained unaffected by Debtor’s rejection of the Agreement. We then address Mission’s contention that its trademark license also remained in effect during the two-year Wind-Down Period. What is at issue for these parties, practically speaking, is whether to classify as prepetition or post-petition liability any damages caused by Debtor’s failure to honor its executory obligations during the two-year Wind-Down Period. A. Section 365(n)(l)(B) allows Mission “to retain its rights (including a right to enforce any exclusivity provision of such contract ...) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law).” Mission would have us read the words “any exclusivity provision of such contract” in the foregoing parenthetical as meaning any “exclusivity provision” in the entire contract (or any supplementary agreement), whether or not the provision grants exclusive use of a pertinent intellectual property right. We disagree. We start in section 365(a) with the universe of all executory contracts that a debtor may seek to reject; section 365(n)(l) then focuses on a subset of that universe (“executory contract[s] under which the debtor is a licensor of a right to intellectual property”); subsection (n)(l)(B) then ■ says what happens to intellectual property rights granted under such contracts (the licensee may “retain its rights”); and the parenthetical merely makes clear that those rights “to such intellectual property” include any exclusivity attributes of those rights. In this manner, subsection (n)(l)(B) protects, for example, an exclusive license to use a patent, but does not protect an exclusive right to sell a product merely because that right appears in a contract that also contains a license to use intellectual property. Our reading aligns with the legislative record. In enacting section 365(n), Congress made clear that it was responding to a “particular problem arising.out of recent court decisions.” S. Rep. No. 100-505, at 5. The limited, “purpose of the bill is to amend Section 365 of the Bankruptcy Code to make clear that the rights of an intellectual property licensee to use the licensed property cannot be, unilaterally cut off.” Id. at 1. The amendment is “not in any way intended to address broader matters under Section 365.” Id. at 5. Congress, it seems, was focused on a narrow issue, and only intended its amendment to address , that issue. It did not intend the scope of its amendment to extend beyond the licensee’s bargained-for intellectual property rights post-rejection, as Mission’s position would necessarily require. Further supporting our reading of the statutory text, Congress’s description of the protected exclusivity rights in both relevant congressional reports is limited to license rights, and does not mention or imply the protection of exclusive rights other than those to intellectual property. The House Report, describing the House’s version of the bill,[4] states that, “[u]nder the legislation, any right in the license agreement giving the licensee an exclusive license will still be enforceable by the licensee, but other rights of the licensee cannot be specifically enforced.” H.R. Rep. No. 100-1012, at 6 (1988). Similarly, 'the Senate Report says that “if the contract granted exclusive use to the licensee, such exclusivity would be preserved to the license.” S. Rep. No. 100-505, at 9. Mission’s fallback position is to argue that, in this instance, its exclusive distribution right is, de facto, a provision that renders its right to use Debtor’s intellectual property exclusive. The unstated premise is that because Mission has an exclusive right to sell certain of Debtor’s products made using Debtor’s intellectual property, no one else can use the intellectual property. Hence, Mission reasons, the .exclusive distribution right is an “exclusivity provision” of the intellectual property right. The most obvious defect in this argument is its premise. The Agreement and record are clear that Debtor can use its intellectual property to make and sell products other than those for which the Agreement grants Mission exclusive distribution rights. The only thing that is exclusive is the right to sell certain products, not the right to practice, for example, the patent that is used to make those products. An exclusive right to sell a product is not equivalent to an exclusive right to exploit the product’s underlying intellectual property. But, argues Mission, because of its exclusive distribution rights, no one can use the Debtor’s patent to make at least some products if those products are to be sold in Mission’s territory. Perhaps. But this is simply a restriction on the right to sell certain products that, like many products, happen to be made using a patent. And the exclusivity Mission seeks to maintain would apply fully even if there were no patent license at all. Given that the right to sell a. product is clearly not included within the statute’s definition of intellectual property, we are not going to treat it as such merely because of a coincidental practical effect it may have in limiting the scope of the manner in which a patent might be exploited, especially where the Agreement itself expressly makes clear that any patent license is nonexclusive. To hold otherwise would be to find buried in a parenthetical to a statutory subsection an implied exception to rejection that would, in practical terms, likely cover as much commercial territory as do some of the rights expressly defined as protected. See Whitman v. Am. Trucking Ass’n, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“Congress ... does not, one might say, hide elephants in mouseholes.”). :The fact that Mission can cite no circuit court precedent for its effort to paint its exclusive distribution right as a de facto exclusive intellectual property right further buttresses our conclusion.[5] Mission also argues that its nonexclusive license of intellectual property “lacks meaningful value” unless it retains ah exclusive right to sell certain of Debtor’s products. Why this is so is not apparent given that section 365(n) protects the nonexclusive license, hence Mission retained the right to use the intellectual property. The Agreement itself spells out myriad ways that Mission could exploit its nonexclusive intellectual property rights that were presumably unaffected by rejection of its exclusive distribution right: Mission could still “sublicense (through multiple tiers), use, reproduce, modify, and create derivative work based on” Debtor’s intellectual property. And if those rights lacked meaningful value, that hardly becomes a reason for turning rightsithat are not intellectual property rights, into intellectual property rights. Rather, it simply suggests that most of the contract’s value was apparently in the exclusive distribution agreement. Nor does the reference in section 365(n)(l)(B) to “any embodiment of such intellectual property” help Mission. Embodiment is a term of art associated with intellectual property. The Senate Report includes a letter informing the Judiciary Committee of the Department of Commerce’s view of the bill, which states that “[although ‘embodiment’ is not defined, we assume the term arises from the copyright law.” S. Rep. No. 100-505, at 12. Black’s Law Dictionary tags the term as belonging to patent law, and offers three alternate definitions: (1) “[t]he tangible manifestation of an invention”; (2) “[t]he method for using this tangible form”; or (3) “[t]he part of a patent application or patent that describes a concrete manifestation of the invention,” Embodiment, Black’s Law Dictionary (10th ed. 2014). Black’s Law Dictionary further notes that while intellectual property “is a mental construct” without “physical structure,” an embodiment “is a specific physical form of the invention” and thus “[e]ach embodiment exists in the real world.” Id. (quoting Morgan D. Rosenberg, The Essentials of Patent Claim Drafting xvii (2012)). Where the statutory language includes a term of art, resort to sources beyond the text is particularly appropriate to make clear the intended meaning of that term. See Molzof v. United States, 502 U.S. 301, 307, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992). Both the Senate Report and the Department of Commerce letter offer additional insight into the meaning of “embodiment” and its application to a licensee’s rights. The Senate Report provides three examples of protected rights, and concludes with two traits that all protected rights must contain: [T]he parties might have agreed that the licensor would prepare a prototype incorporating the licensed intellectual property. If such a prototype was prepared prior to the filing of the petition for relief, but had not been delivered to the licensee at that time, then the licensee can compel the delivery of the prototype in accordance with the terms of the rejected license. Other examples of embodiments include genetic material needed to produce certain biotechnological products and computer program source codes. There are many other possible examples of embodiments, but critical to any right of the licensee to obtain such embodiments under this bill is the prepetition agreement of the parties that the licensee have access to such material and the physical existence of such material on the day of the bankruptcy filing. S. Rep. No. 100-505, at 9-10 (emphasis added). The Department of Commerce letter states: Where the licensed intellectual property is not a work of authorship, we assume the term “embodiment” would be interpreted in a similar sense of enablement in a manner reasonable in the circumstances and would not necessarily include all physical manifestations of the intellectual property. For example, an embodiment of a licensed process might be interpreted to include technical data sufficient to enable the licensee to operate the process, but not a manufacturing facility using (or embodying) the process; and an embodiment of a licensed invention might be interpreted to include a sample of the invention, but not all inventory. S. Rep. No. 100-505, at 12 (emphasis added). A few common themes appear in these explanations. First, the pre-petition agreement must give the licensee access to the embodiment of intellectual property. Second, an embodiment of intellectual property is a tangible or physical object that exists pre-petition. Third, an embodiment of intellectual property is something inherently limited in number—it is a prototype or example of a product, but does not include all products produced using the intellectual property. Finally, we can infer that the purpose of this' provision is to allow the licensee to exploit its right to the underlying intellectual property. Here, we have no object to which Mission requires access in order to exploit an intellectual property right. Rather, we have a prosaic, nonexclusive right to use a patented process, and an unremarkable and entirely independent right to be the exclusive distributor of some but not all goods made with that process. There is simply no “embodiment” at issue in the relevant statutory sense. Nor does this case, as Mission contends, bear on the enforceability of all negative covenants independent of an intellectual property license. If a party possesses an intellectual property license, perhaps the Code may protect from rejection certain negative covenants—such as confidentiality—that do not materially restrict the debtor’s reorganization, are tied closely to the intellectual property license, and are necessary to implement its terms. See Biosafe Int’l, Inc. v. Controlled Shredders, Inc. (In re Szombathy), Nos. 94 B 15536, 95 A 01035, 1996 WL 417121, at *11 (Bankr. N.D. Ill. July 9, 1996) rev’d in part sub nom. Szombathy v. Controlled Shredders, Inc., Nos. 94 B 15536, 95 A 01035, 1997 WL 189314 (N.D. Ill. Apr. 14, 1997). But we are not presented with that situation here. Finally, we observe that Mission salts its brief with several undeveloped suggestions that rejection under section 365(a), even if allowed, might not extinguish a right to .demand specific performance of the negative covenant implicit in the exclusive distribution rights. Mission attempts to support these suggestions by citing In re Szombathy, 1996 WL 417121, and by emphasizing that case’s reliance on a quote from the Department of Commerce’s letter to the Senate Judiciary Committee. Neither source seems to come close to carrying the meaning claimed by Mission. In any event, even as Mission tendered an analogous argument in connection -with its trademark license (which we address, below), it never raised any such argument in the bankruptcy court as a basis for preserving its exclusive distribution rights. Hence, the argument is waived in this civil action. See Argentaria v. Wiscovitch-Rentas (In re Net Velázquez), 625 F.3d 34, 40 (1st Cir. 2010) (“The proposition is well established that, ‘absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.’ ” (quoting Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992))). B. We next consider whether Mission retained its rights to use Debtor’s trademarks post-rejection. In defining the intellectual property eligible for the protection of section 365(n), Congress expressly listed six kinds of intellectual property. 11 U.S.C. § 101(35A). Trademark licenses (hardly something one would forget about) are not listed, even though relatively obscure property such as “mask work protected under chapter 9 of title 17” is included. Id. Nor does the statute contain any catchall or residual clause from which one might infer the inclusion of properties beyond those expressly listed. One might reasonably conclude that Congress’s decision not to include trademark licenses within the protective ambit of section 365(n) must mean that such licenses are not exempt from section 365(a) rejection. On the other hand, the conclusion that an agreement finds no haven from rejection in section 365(n) does not entirely exhaust the possible arguments for finding that a right under that agreement might otherwise survive rejection. For example, we have held that a counter-party’s right to compel the return of its own property survives rejection of a contract under which the debtor has possession of that property. See Abboud v. The Ground Round, Inc. (In re The Ground Round, Inc.), 482 F.3d 15, 19 (1st Cir. 2007). This case, though, does not present us with a request by a party following rejection to recover its own property temporarily in the hands of the debtor. Rather, it presents a demand by a party to continue using the debtor’s property. Regarding trademarks specifically, the Senate Report states that Congress “postpone[d]” action on trademark licenses “to allow the development of equitable treatment of this situation by bankruptcy courts.” S. Rep. No. 100-505, at 5. The only circuit to address this issue squarely has resisted the temptation to find in this ambiguous comment outside the statutory text a toehold for unfettered “equitable” dispensations from section 365(a) rejection when it would otherwise apply. See Sunbeam, 686 F.3d at 375 (“What the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be ‘inequitable.’ ”). We agree. See Law v. Siegel, — U.S. —, 134 S.Ct. 1188, 1194-95, 188 L.Ed.2d 146 (2014) (‘We have long held that ‘whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.” (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988))). There is,, though, an alternative argument for finding that a right to use a debtor’s .trademark continues post-rejection. That argument rests not on equitable dispensation from rejection, but instead on an exploration- of exactly what rejection means..The argument, as accepted by the Seventh Circuit in Sunbeam, runs thus: Under section 365(g), section 365(a) rejection- constitutes, a breach of contract that “frees the estate from the obligation to perform.” Sunbeam, 686 F.3d at 377 (quoting Thompkins v. Lil’ Joe Records, Inc., 476 F.3d 1294, 1306 (11th Cir. 2007)). “But nothing about this process implies that any rights of the other contracting party have been vaporized.” Id. Therefore, reasoned the Seventh Circuit, while rejection converts a debtor’s duty to perform into a liability for pre-petition damages, it leaves in place the counterparty’s right to continue. using a trademark licensed to it under the rejected agreement. In so reasoning, the Seventh Circuit found itself unpersuaded by the contrary approach taken by the Fourth Circuit in Lubrizol. Sunbeam, 686 F.3d at 378; see also In re Exide Techs., 607 F.3d 957, 964-68 (3d Cir. 2010) (Ambro, J., concurring). Of course, to be precise, rejection as Congress viewed it does not “va-f porize” a right. Rather, rejection converts the right into a pre-petition claim for damages. Putting that point of vocabulary to one side, and leaving open the possibility that courts may find some-unwritten limitations on the full effects of section 365(a) rejection, we find trademark rights to provide' a poor candidate for such dispensation. Congress's principal aim in providing for rejection was to “release the debtor’s estate-from burdensome obligations that can impede a successful reorganization.” Bildisco & Bildisco, 465 U.S. at 528, 104 S.Ct. 1188. Sunbeam therefore largely rests on the unstated premise that it is possible to free a debtor from any continuing performance obligations under a trade-. mark license even while preserving the licensee’s right to use the trademark. See Sunbeam, 686 F.3d at 377. Judge Ambro’s concurrence in In re Exide Technologies shares that premise. See 607 F.3d at 967 (Ambro, J., concurring) (assuming that the bankruptcy court-could allow the licensee to retain trademark rights even while giving the debtor “a fresh start”). Careful examination undercuts that premise because the effective licensing of a trademark requires that the trademark owner—here Debtor, followed by any purchaser of its assets—monitor and exercise control over the quality of the goods sold to the public under cover of the trademark. See 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 18:48 (5th ed. 2017) (“Thus, not only does the trademark owner have the right to control quality, when it licenses, it has the duty to control quality.”). Trademarks, unlike patents, are public-facing messages to consumers about the relationship between the goods and the trademark owner. They signal uniform quality and also protect a business from competitors who' attempt to profit from its developed goodwill. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 636 (1st Cir. 1992). The licensor’s monitoring and control thus serve to ensure that the public is not deceived as to the nature or quality of the goods sold. Presumably, for this reason, the Agreement expressly reserves to Debtor the ability to exercise this control: The Agreement provides that Debtor “shall have the right to review and approve all uses of its Marks,” except for certain pre-approved uses. Importantly, failure to monitor and exercise this control results in a so-called “naked.license,” jeopardizing the continued validity of the owner’s own trademark rights. McCarthy, supra, § 18:48; see also Eva’s Bridal Ltd. v. Halanick Enters., Inc., 639 F.3d 788, 790 (7th Cir. 2011) (“[A] naked license abandons a mark.”); Restatement (Third) of Unfair Competition § 33 (“The owner , of a trademark, trade name, collective mark, or certification mark may license another to use the designation. ... Failure of the licensor to exercise reasonable control over the use of the designation by the licensee can result in abandonment....”). ' The Seventh Circuit’s approach, therefore, would allow Mission to retain the use of Debtor’s trademarks in a manner that would force Debtor to choose between performing executory obligations arising from the continuance of the license or risking the permanent loss of its trademarks, thereby diminishing their value to Debtor, whether realized directly or through an asset sale. Such a restriction on Debtor’s ability to free itself from its' executory obligations, even if limited to trademark licenses alone, would depart from the manner in which section 365(a) otherwise operates. And the logic behind that approach (no rights of the counterparty should be “vaporized” in favor of a damages claim) would seem to invite further leakage. If trademark rights categorically survive rejection, then why not exclusive distribution rights as well? Or a right to receive advance notice before termination of performance? And so on.- Although claiming to follow Sunbeam, our dissenting colleague seems to reject its categorical approach in favor of what Sunbeam itself rejected—an “equitable remedy” that would consider in some unspecified manner the “terms of the Agreement, and non-bankruptcy law.” See Sunbeam, 686 F.3d at 375-76. In so doing, our colleague gives great weight to a few lines in the Senate Report, treating them variously as “guidance,” as a statement of Congress’s “intent,” and even as a mandate that “instruct[s]” the courts. In short, the-dissent’s interpretative approach seems to accord a line in the Senate Report the force of a line in the statute-itself. Moreover, it does so by taking a line out of the Senate Report addressing section 365(n), which itself has no relevant ambiguity, and then uses that line to inform the dissent’s interpretation of the previously enacted section 365(a). And while it is true that the Senate Report references equitable consideration, the dissent also seems to overlook the fact that,when Congress otherwise intended to grant bankruptcy courts the ability to “equitably” craft exceptions to the Code’s rules, it did so in the statute itself. See, e.g., 11 U.S.C. § 365(d)(5) (requiring the trustee to perform the obligations of the debtor until an unexpired lease is assumed or rejected “unless the court, after notice and a hearing and based on the equities ,of the case, orders otherwise”); id § 552(b)(1) (stating that a security agreement may extend to proceeds or profits acquired after the commencement of the case “to the extent provided by such security agreement and by applicable non-bankruptcy law, except' to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise”); see also id. § 502(j) (“A reconsidered claim may be allowed or disallowed according to the equities of the case.”); id. § 557(d)(2)(D) (allowing the expedited disposition of grain by, inter alia, .“such other methods as is equitable in the case”); id. § 723(d) (“[T]he court, after notice and a hearing, shall determine an equitable distribution of; -the surplus so recovered...,”); id. § 1113(c) (listing .whether “the balance of the equities clearly favors rejection of such .agreement” as a factor for a court to consider in determining whether to approve an application for rejection of a collective bargaining agreement); id. § 1114(g) (requiring a court to modify the payment of retirement benefits if the court finds that “such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities”). Even if we did sit in the chancellor’s chair in applying section 365(a), we would likely hesitate to adopt our colleague’s approach. Under such a case-specific, equitable approach, one might in theory preclude rejection only where the burden of quality assurance on the debtor will be minimal. The problem, though, is that in the bankruptcy context especially, where the li-censor and licensee are at odds over continuing to deal with each other, the burden will likely often be greater than normal. Here, for example, the adversarial relationship between Debtor and Mission may portend less eager compliance. More importantly, in all cases there will be some burden, and it will usually not be possible to know at the time of the bankruptcy proceeding how great the burden will prove to be, as it will depend very much on the subsequent actions of the licensee. Conversely, the burden imposed on the counterparty of having its trademark right converted to a prepetition damages claim at a time when the relationship signaled by the trademark is itself ending will in most instances be less than the burden of having patent rights so converted. The coun-terparty may still make and sell its products—or any products—just so long as it avoids- use of the trademark precisely when the message conveyed by the trademark may no longer be accurate. We therefore find unappealing the prospect of saddling bankruptcy proceedings with the added cost and delay of attempting to draw fact-sensitive and unreliable distinctions between greater and lesser burdens of this type. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 649, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) (“[I]t is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction.”). There is, too, the public’s interest in not being misled as to the origin and quantity of goods that consumers buy. In sum, the approach taken by Sunbeam entirely ignores the residual enforcement burden it would impose on the debtor just as the Code otherwise allows the debtor to free itself from executory burdens. The approach also rests on a logic that invites further degradation of the debtor’s fresh start options. Our colleague’s alternative, “equitable” approach seems similarly flawed, and has the added drawback of imposing increased uncertainty and costs on the parties in bankruptcy proceedings. For these reasons, we favor the categorical approach of leaving trademark licenses unprotected from court-approved rejection, unless and until Congress should decide otherwise. See James M. Wilton & Andrew G. Devore, Trademark Licensing in the Shadow of Bankruptcy, 68 Bus. Law. 739, 771-76 (2013). C. Mission’s final argument is that the bankruptcy court erred by not holding an adversary proceeding under Bankruptcy Rule 7001. Mission contends that because the rule governing adversary proceedings includes within its ambit determinations of an “interest in property,” the bankruptcy court was required to hold such a hearing to determine the scope of Mission's rights. The bankruptcy court instead treated the issue as a contested matter under Rule 9014. We need not address this argument directly, because we find that even if an adversary proceeding was required, any error was harmless. Mission contends that it was prejudiced because it was not given a fair opportunity to develop an evidentiary record. But the issues at stake can be resolved—and are resolved, in our de novo review—without reliance on any disputed facts outside the four corners of the Agreement. The logical leap Mission asks us to make—that extrinsic evidence would be both appropriate and lead to a different result—is unsupported by any possible extrinsic evidence to which Mission points. Further, the bankruptcy court permitted Mission and Debtor to conduct discovery following its September 21, 2015 order. There is no evidence, however, that either party had a need for or in fact did conduct discovery, and if they did, Mission offers no explanation for how this discovery generated any factual dispute that need be resolved in a testimonial hearing. Requiring Debtor to commence an adversary proceeding would only have delayed the resolution of critical issues without changing the bankruptcy court’s ultimate determination. Y. For the foregoing reasons, the bankruptcy court’s decision is affirmed. . In addition to the United States, the exclusive geographic territory also included "other countries and territories that [Mission] acquires exclusive distribution rights to pursuant to its first rights of refusal and notice.” . Although this provision of the statute only refers to the powers of a trustee, per 11 U.S.C. § 1107(a), a Chapter 11- "debtor in possession shall have all the rights ,,. and powers, and shall perform all the functions and duties, ... of a trustee serving in a case under this chapter,” See also In re FBI Distrib. Corp., 330 F.3d at 42 n.8 (citing this provision). . We do nevertheless pay great attention to the considered opinion of the three experienced bankruptcy judges who sit on the BAP. Among other things, our consideration of such an opinion reduces the likelihood that our court of general appellate jurisdiction is blindsided by the effect that a decision might have on matters or issues of bankruptcy law and practice that are beyond the ken of the parties in a particular proceeding. . Congress ultimately adopted the Senate version, although the language of this section of the House bill is identical to its Senate counterpart. . Mission cites Encino Bus. Mgmt., Inc. v. Prize Frize, Inc. (In re Prize Frize, Inc.), 32 F.3d 426 (9th Cir. 1994), but the contract in that case granted an “exclusive license to utilize the proprietary‘rights.” Id. at 427. This case is clearly distinguishable, as Mission was granted no such right.